LEE R. BOGDANOFF (State Bar No. 119542)
DAVID M. STERN (State Bar No. 67697)
MATTHEW C. HEYN (State Bar No. 227474)
KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 Avenue of the Stars, 39th Floor
Los Angeles, California 90067-6049
Telephone: (310) 407-4000
Facsimile: (310) 407-9090
E-mail: lbogdanoff@ktbslaw.com, dstern@ktbslaw.com, mheyn@ktbslaw.com

ANDREW L. SANDLER (Admitted *Pro Hac Vice*)
BENJAMIN B. KLUBES (Admitted *Pro Hac Vice*)
BENJAMIN P. SAUL (*Pro Hac Vice* Admittance Pending)
CAITLIN M. KASMAR (To be Admitted *Pro Hac Vice*)
BRADLEY A. MARCUS (To be Admitted *Pro Hac Vice*)
BUCKLEYSANDLER LLP
1250 24th Street N.W., Suite 700
Washington, District of Columbia 20037
Telephone: (202) 349-8000
Facsimile: (202) 349-8080
E-mail: asandler@buckleysandler.com, bklubes@buckleysandler.com,
        bsaul@buckleysandler.com, ckasmar@buckleysandler.com,
        bmarcus@buckleysandler.com

Counsel for Alfred H. Siegel, Chapter 7 Trustee

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF CALIFORNIA

LOS ANGELES DIVISION

| | |
|---|---|
| In re | Case No.: 2:08-bk-21752-BB |
| INDYMAC BANCORP, INC., | Chapter 7 |
| Debtor. | Adversary Proc. No._____ |
| ALFRED H. SIEGEL, solely as Chapter 7 Trustee of the estate of IndyMac Bancorp, Inc., | **COMPLAINT:** |
| Plaintiff, | **(1) OBJECTING TO CLAIMS, (2) FOR SUBORDINATION OF CLAIMS, TOGETHER WITH (3) COUNTERCLAIMS FOR BREACHES OF THE DUTIES OF CARE, LOYALTY, AND GOOD FAITH AND FOR CORPORATE WASTE** |
| v. | |
| LOUIS E. CALDERA, LYLE E. GRAMLEY, HUGH M. GRANT, PATRICK C. HADEN, TERRANCE G. HODEL, ROBERT L. HUNT II, LYDIA H. KENNARD, BRUCE G. WILLISON, AND MICHAEL E. PERRY, | |
| Defendants. | |

COMPLAINT WITH OBJECTIONS AND COUNTERCLAIMS TO DEFENDANTS' CLAIMS

# <u>TABLE OF CONTENTS</u>

I.  NATURE OF THIS ACTION ................................................................. 2

II.  JURISDICTION AND VENUE .......................................................... 6

III.  THE PARTIES ................................................................................. 7

    A.  Plaintiff ................................................................................. 7

    B.  Defendants ............................................................................ 8

    C.  Defendants' Proofs of Claim .............................................. 10

IV.  FACTUAL ALLEGATIONS ........................................................... 10

    A.  The Bank's Formation and Collapse and Bancorp's
        Bankruptcy ........................................................................ 10

    B.  The Treasury Report .......................................................... 12

    C.  The Backdating Report ...................................................... 12

    D.  Allegations Related Solely to Events in 2008 .................... 13

        1.  May 2008 Backdating of $18 Million of a $50
            Million Capital Contribution ..................................... 15

        2.  March 31, 2008 Downstream Transfer of $70
            Million to Bancorp's Detriment ................................ 17

    E.  Additional Allegations ....................................................... 21

        1.  2007 Downstream Transfers to Bancorp's Detriment ...... 21

        2.  The Defendants' Abdication of Responsibility and
            Decision-Making and Failure to Supervise
            Management ................................................................. 23

            (a)  The Defendants' "Disdain for Corporate
                Governance" ..................................................... 24

            (b)  The Director Defendants Rubber-Stamped
                Defendant Perry and Other Officers' Cavalier
                Attitude Toward Raising Much-Needed Capital ............ 30

            (c)  The Director Defendants Provided Unwavering
                Support of Defendant Perry and Management ................ 34

            (d)  Failure to Consider or Properly Approve
                Downstream Transfers ....................................... 34

COMPLAINT WITH OBJECTIONS AND COUNTERCLAIMS TO DEFENDANTS' CLAIMS

3.    Disregard for Opportunities to Raise Capital from Outside Investors ................................................. 35

(a)    Overview ......................................................... 35

(b)    MetLife—Perry Rejects a Potential Investor Twice, While the Director Defendants Remain Idle ................... 39

(c)    Warburg—Perry, Not Wanting to Signal "Weakness" to the Market, Unilaterally Kills a Potential Transaction With a Potential Investor, While the Director Defendants Ignore Their Obligation to Assess the Transaction .............................. 41

(d)    Goldman Sachs—Perry and Wohl Quickly Cut Off Talks With an Investor, While the Director Defendants Again Ignore Their Responsibilities Regarding Such Deals ........................................ 44

(e)    Mass Mutual—The Defendants Admit the Investor is Attractive, Yet Do Nothing to Pursue a Deal .............. 45

(f)    Ares—The Director Defendants Ignore Their Duties Yet Again, While the Investor Calls Perry's Bluff and Abandons the Deal .......................................... 46

(g)    Other Attempts to Raise Capital Also Fall Short Due to the Defendants' Dilatory and Ineffectual Approach ......................................................... 48

4.    Disregard for Financial Red Flags ..................................... 48

(a)    Negative Analyst Reports Proliferate From 2005 Forward ......................................................... 48

(b)    The Defendants Were or Should Have Been Aware of the Poor Performance of Other Mortgage Lenders with Similar Business Models ........................... 51

(c)    Defendants Knew of, but Disregarded, Numerous Breaches of Bancorp Liquidity Policy and Capital Policies .......................................................... 52

(d)    The Defendants Knew of, but Disregarded, Signs of Worsening Performance at Bancorp and Continued to Adhere to the Same Business Plan Despite Increasingly Negative Results ................................. 55

(i)    The Defendants Were Apprised of, but Chose to Ignore, Early Warning Signs ................. 55

(ii)    The Defendants Continue to Ignore Red Flags Despite the Increasing Frequency and Severity of Negative Financial Indicators ............ 57

- ii -

     (iii) Perry Admits the Losses Resulted From Poor Business Practices that Focused on Loan Volume Rather Than Quality – Including Defendants' Fundamental Failure to Ensure Basic Loan Underwriting Practices Were In Place and Followed ................................................ 59

V. CLAIMS FOR RELIEF ................................................................ 62

  A. Disallowance and Subordination Claims .................................... 62

   Count I (Disallowance Under Bankruptcy Code Section 502(b) Against All Defendants) ........................................ 62

   Count II (Subordination of Claims Under Bankruptcy Code Section 510(b) Against Defendants Perry, Gramley, Haden, and Willison) ................................................ 64

   Count III (Subordination of Claims Under Bankruptcy Code Section 510(c) Against All Defendants) ................ 65

  B. Counts Based on Allegations Solely Related to Events in 2008 ................................................................................ 67

   Count IV (Claim for Breach of Duty of Care Against All Defendants) ................................................................ 67

   Count V (Claim for Breach of Duties of Loyalty and Good Faith Against All Defendants) ................................ 69

   Count VI (Claim for Corporate Waste Against All Defendants) ................................................................ 72

  C. Counts Based on Additional Factual Allegations ........................ 74

   Count VII (Claim for Breach of Duty of Care Against All Defendants) ................................................................ 74

   Count VIII (Claim for Breach of Duties of Loyalty and Good Faith Against All Defendants) ................................ 76

   Count IX (Claim for Corporate Waste Against All Defendants) ................................................................ 79

VI. PRAYER FOR RELIEF ................................................................ 80

- iii -

**COMPLAINT OBJECTING TO CLAIMS, FOR SUBORDINATION OF
CLAIMS, TOGETHER WITH COUNTERCLAIMS FOR BREACHES OF
THE DUTIES OF CARE, LOYALTY, AND GOOD FAITH
AND FOR CORPORATE WASTE**

Plaintiff Alfred H. Siegel ("Plaintiff"), solely as Chapter 7 Trustee

for the estate of IndyMac Bancorp, Inc. ("Bancorp" or the "Debtor"), by his

undersigned counsel, as specified below, alleges for his Complaint and Objections

and Counterclaims to Defendants' Claims ("Complaint") the following, based

upon, among other things:  (a) the investigation conducted by and through his

counsel; (b) review and analysis of filings made by Bancorp with the United

States Securities and Exchange Commission ("SEC"); (c) review and analysis of

data submitted by IndyMac Bank, F.S.B. (the "Bank" or "IndyMac Bank" and,

together with Bancorp, the "Company") to the United States Department of the

Treasury's Office of Thrift Supervision (the "OTS"); (d) review and analysis of

data contained in the United States Department of the Treasury's Office of

Inspector General's (the "OIG") February 26, 2009 Audit Report entitled "Safety

and Soundness: Material Loss Review of IndyMac Bank, F.S.B." (OIG-09-032)

("Treasury Report");[1] (e) review and analysis of data contained in the OIG's May

21, 2009 Audit Report entitled "Safety and Soundness: OTS Involvement With

Backdated Capital Contributions by Thrifts" (OIG-09-037) (the "Backdating

Report");[2] (f) review and analysis of press releases, public statements, news

articles, securities analysts' reports, statements by government agencies, and

officials, documents filed in securities and other class actions as well as civil

---

[1]    Office of Inspector General, Dep't of the Treasury, Audit Report, Safety and Soundness:
Material Loss Review of IndyMac Bank, F.S.B., OIG-09-032 (Feb. 26, 2009).  A true and
correct copy of the Treasury Report is attached hereto as Exhibit 1.

[2]    Office of Inspector General, Dep't of the Treasury, Audit Report, Safety and Soundness: OTS
Involvement With Backdated Capital Contributions by Thrifts, OIG-09-037 (May 21, 2009).  A
true and correct copy of the Backdating Report is attached hereto as Exhibit 2.

- 1 -

1  lawsuits in which Bancorp or Bank is named as a defendant, other filings in <u>In re</u>

2  <u>IndyMac Bancorp, Inc.</u>, No. 2:08-bk-21752-BB (C.D. Cal. filed July 31, 2008)

3  ("Bankruptcy Case"), and other publications disseminated by or concerning

4  Bancorp and Bank; and (g) other publicly-available information about Bancorp

5  and Bank.  Many of the facts supporting the allegations contained herein are

6  known only to the Defendants or are within their control.  Plaintiff believes that,

7  after reasonable opportunity for discovery, substantial additional evidentiary

8  support will exist for the allegations in this Complaint.

9  ## I.  <u>NATURE OF THIS ACTION</u>

10  1.  Bancorp was the indirect holding company for the Bank, which was

11  formerly one of the 10 largest residential mortgage originators and servicers in the

12  United States.  On July 11, 2008, in part due to gross capital inadequacy, liquidity

13  concerns, and extremely poor and eroding asset quality at IndyMac Bank, the

14  OTS seized the Bank and named the FDIC as conservator.  Subsequently, the

15  FDIC became receiver for the Bank.  At the time, the failure of the Bank was the

16  second largest failure of a thrift banking institution in United States history.  On

17  July 31, 2008, Bancorp filed a petition for relief under Chapter 7 of the

18  Bankruptcy Code.

19  2.  Bancorp's mortgage banking operations were conducted through its

20  indirect subsidiary IndyMac Bank.  Through IndyMac Bank, Bancorp focused on

21  producing, selling, servicing, and purchasing securitized pools of predominately

22  Alt-A single-family mortgage loans.  The Bank had a heavy production focus on

23  high-risk mortgage loans, for which the secondary market evaporated over the

24  course of 2007.  As a result, the Bank was unable to securitize and sell billons of

25  dollars of mortgage loans in late 2007, and instead was required to hold those

26  loans on its balance sheet, creating enormous losses and acute capital

27  inadequacies.

28

COMPLAINT WITH OBJECTIONS AND COUNTERCLAIMS TO DEFENDANTS' CLAIMS

3.    In response to the Bank's massive need for capital, which grew as the Bank's problems worsened, Perry, together with the Director Defendants (as defined below) he led, acted in a manner that not only minimized the possibility of saving the Bank and Bancorp, but also maximized the damage and injuries to Bancorp.

4.    Perry dismissed or failed to pursue numerous opportunities to raise capital from third parties that would result in dilution of his ownership and control, and that of the existing Director Defendants.  Perry's means included driving a Director who challenged his practices and objectives from the Board, ignoring inquiries from potential investors, failing to disclose relevant information to the Board in a timely manner, and, in order to save face rather than address the actual financial condition of the entities he led, rejecting any discussions that might suggest Bancorp was struggling.  As with Perry, the Director Defendants also knowingly and completely breached their fiduciary responsibilities to pursue third-party capital, as evidenced most obviously by their failure to even establish a Board-level committee to address this issue until late April 2008—less than three months before the Company collapsed and long after it would have become apparent to any competent director or manager that Bancorp and the Bank could only survive by raising billions of dollars in capital.

5.    Despite knowing the Bank needed billions of dollars in additional capital to survive—an amount so large that it could only be obtained realistically through the very third-party investments the Defendants ignored and failed to pursue—the Defendants, nevertheless, caused Bancorp to "downstream" hundreds of millions of dollars to the Bank.  The amounts Bancorp downstreamed to the Bank, therefore, although very material to Bancorp's financial well-being, were wholly immaterial in terms of addressing the capital needs of the Bank.  In fact, such downstreaming of funds from Bancorp to the Bank served no conceivable

- 3 -

COMPLAINT WITH OBJECTIONS AND COUNTERCLAIMS TO DEFENDANTS' CLAIMS

1   purpose other than to drain Bancorp of its assets and extend Perry and the

2   Director Defendants' stay in their positions for a few more months until the Bank

3   collapsed.  More specifically, as set forth in the Treasury Report, in March 2008,

4   a FDIC liquidity analysis showed ***the Bank needed up to $3.5 billion in***

5   ***additional capital to avoid failing***.  The FDIC's figure is over $3.3 billion more

6   than the amount that Bancorp, after receiving the FDIC's liquidity analysis,

7   downstreamed to the Bank in 2008.  Indeed, Bancorp downstreamed so much of

8   its own cash that those same transfers violated Bancorp's own internal limits on

9   the minimum amounts to maintain in its own accounts.  Put differently, the 2008

10   Downstream Transfers (as defined below) from Bancorp to the Bank equal less

11   than four percent of the capital the FDIC informed the Bank that it needed to raise

12   in order to survive.  Accordingly, the 2008 Downstream Transfers from Bancorp

13   to the Bank, which left the Bank falling more than 96 percent short of the

14   minimum amount of capital it needed to continue operations, had no chance

15   whatsoever to prevent the Bank's failure and could only deplete and did, in fact,

16   deplete the cash of Bancorp.

17        6.      As further evidence of their total disregard of Bancorp's interests and

18   of the irresponsibility of their downstreaming strategy, in May 2008, shortly

19   before Bancorp's bankruptcy, Perry and the Director Defendants not only caused

20   Bancorp to downstream $50 million dollars to the Bank, but also deliberately

21   backdated $18 million of that transfer from May 9, 2008 to March 31, 2008, a

22   measure that, among other things, was calculated to conceal the actual financial

23   condition of the Bank.

24        7.      The Defendants knew or reasonably should have known that the

25   Bank was on an unsustainable path and that Bancorp had to increase dramatically

26   and enormously the Bank's capital via a transaction that would oust existing

27   management and substantially dilute any Bancorp stock that the Defendants held.

28

COMPLAINT WITH OBJECTIONS AND COUNTERCLAIMS TO DEFENDANTS' CLAIMS

1  Despite this knowledge and in breach of their fiduciary duties, the Defendants

2  allowed the Bank to deplete Bancorp assets through downstream transfers to the

3  Bank that they knew would not solve the Bank's problems and would, at best,

4  only delay its failure.

5      8.    Thus, as described in this Complaint, the Defendants repeatedly

6  breached their fiduciary duties to Bancorp, including breaching their duty of care,

7  duty of loyalty, duty of good faith, and duty to oversee and manage Bancorp.

8  Specifically, these breaches include, among others: the Defendants' abdication of

9  responsibility and decision-making and their failure to supervise management at

10 Bancorp, causing direct harm to Bancorp; the Defendants' failure to avoid

11 unsound transactions—including, for example, nearly $355,000,000 in capital that

12 they caused to be contributed improperly from Bancorp to the Bank—resulting in

13 losses and other direct harm to Bancorp; the Defendants' failure to review and act

14 properly upon potential opportunities to raise much-needed capital from outside

15 investors or find purchasers for Bancorp's assets, thereby causing losses and

16 direct harm to Bancorp; and the Defendants' failure to recognize and act upon

17 financial red flags regarding Bancorp's weak financial condition, which caused

18 losses and other direct harm to Bancorp.  In addition, the Defendants wasted the

19 corporate assets of Bancorp by deliberately downstreaming monies from Bancorp

20 to the Bank despite the obvious inadequacy of these transfers to reverse the

21 Bank's path to failure or provide any other benefit to Bancorp.

22     9.    By this Complaint, therefore, Plaintiff brings several claims against

23 the Defendants.  First, Plaintiff seeks to disallow the proofs of claim filed by each

24 of the Defendants and, to the extent allowed, to subordinate the proofs of claim

25 based, inter alia, on there being claims for damages arising from the purchase or

26 sale of Bancorp stock, or for reimbursement or contribution on account of such a

27 claim, including alleged indemnity or contribution rights, and/or because of the

28

- 5 -

COMPLAINT WITH OBJECTIONS AND COUNTERCLAIMS TO DEFENDANTS' CLAIMS

1  respective Defendant's inequitable conduct described below.  Second, Plaintiff

2  seeks to recover the damages Bancorp's estate has suffered as a result of the

3  Defendants' egregious decision to downstream monies from Bancorp to the Bank

4  in the face of the Bank's near certain failure, thereby causing Bancorp to engage

5  in wasteful corporate expenditures.  With respect to his breach of fiduciary duty

6  and corporate waste claims, Plaintiff alleges discrete counts that relate solely to

7  acts and/or omissions in 2008, as well as separate counts that relate to a broader

8  scope of acts and/or omissions.  Finally, Plaintiff seeks to recover the damages

9  Bancorp's estate has suffered as the result of the Defendants' conscious,

10  deliberate, and/or grossly reckless acts and/or omissions in breach of their

11  fiduciary duties of care, loyalty, and good faith to Bancorp.

12  **II.    <u>JURISDICTION AND VENUE</u>**

13         10.    This adversary proceeding arises out of and is related to the

14  Bankruptcy Case, <u>In re IndyMac Bancorp, Inc.</u>, No. 2:08-bk-21752-BB, a Chapter

15  7 case currently pending before the Court.  <u>See</u> Fed. R. Bankr. P. 7008(b). The

16  Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C.

17  §§ 157(a) and 1334(b).

18         11.    This adversary proceeding is a core proceeding pursuant to 28 U.S.C.

19  §§ 157(b)(2)(A), (B), (C), and (O).

20         12.    In the alternative, to the extent the claims for relief are not related to

21  the Bankruptcy Case, this Court should exercise supplemental jurisdiction

22  pursuant to 28 U.S.C. § 1367.

23         13.    Venue is proper in this Court pursuant to 28 U.S.C. § 1409(a)

24  because this is a proceeding arising under Title 11 or arising in or related to a case

25  under Title 11 of the Bankruptcy Code.

26

27

28                                          - 6 -

COMPLAINT WITH OBJECTIONS AND COUNTERCLAIMS TO DEFENDANTS' CLAIMS

14. This objection to claims, together with counterclaims, is properly brought by adversary proceeding pursuant to Fed. R. Bankr. P. 3007(b), 7001(1) and 7001(8).

**III.    THE PARTIES**

**A.    Plaintiff**

15. Plaintiff Alfred H. Siegel is the Chapter 7 Trustee for the estate of Bancorp in the Bankruptcy Case, currently pending in the United States Bankruptcy Court for the Central District of California, Los Angeles Division (the "Court").

16. Plaintiff, as representative of Bancorp's estate, which succeeds to the rights and interests of Bancorp, has standing to object to the claims that the Defendants have filed in the Bankruptcy Case and to bring the claims alleged herein. Bancorp's estate has suffered significant and direct injuries, which are described in this Complaint. Defendants, moreover, have proximately caused these injuries by consciously, deliberately, and recklessly disregarding their fiduciary duties of care, loyalty, good faith, oversight, and management. This Court can redress these injuries by awarding actual and punitive damages in amounts to be determined at trial and by disallowing and subordinating the Defendants' proofs of claim.

17. Bancorp is a corporation incorporated in the State of Delaware. Its principal place of business was 888 E. Walnut Street, Pasadena, California 91101. Prior to the Receivership Date and the Bankruptcy Petition Date (both as defined below), Bancorp was a savings and loan holding company that indirectly owned IndyMac Bank and IndyMac Bank's subsidiaries.

18. IndyMac Bank was a federal savings bank chartered pursuant to the Home Owners' Loan Act, 12 U.S.C. §§ 1461-70. IndyMac Federal Bank, F.S.B. was established subsequent to the FDIC's placing IndyMac Bank into

- 7 -

COMPLAINT WITH OBJECTIONS AND COUNTERCLAIMS TO DEFENDANTS' CLAIMS

1   conservatorship and later receivership.  Throughout this Complaint, Plaintiff will

2   refer to both IndyMac Bank and IndyMac Federal Bank, F.S.B. as the "Bank."

3       **B.    <u>Defendants</u>**

4       19.    Each of the Defendants named in this Complaint served on the Board

5   of Directors of Bancorp ("Defendants" and, when referring to all Defendants

6   except Perry, "Director Defendants").

7       20.    As used in this Complaint, the term "Board," unless otherwise

8   specified, shall be understood to refer to Bancorp's Board of Directors.

9       21.    Defendant Perry was Chairman of the Board and Bancorp's Chief

10  Executive Officer.  Perry served as Director of Bancorp from its inception until

11  July 2008.  Perry is a Director Defendant and is also named as a Defendant in his

12  capacity as a Bancorp officer.  Perry is a resident of California.

13      22.    As reported in Bancorp's March 24, 2008 proxy statement, on its

14  Schedule 14A filed with the SEC, Perry had "responsibility for the day-to-day

15  operations of [Bancorp since] 1993."

16      23.    Defendant Louis E. Caldera ("Caldera") served as a director of

17  Bancorp from at least January 2004 until July 2008.  Caldera is a resident of New

18  Mexico.

19      24.    Defendant Lyle E. Gramley ("Gramley") served as a director of

20  Bancorp from at least January 2004 until July 2008.  From 2004 through 2008,

21  Gramley served on the Board's Enterprise Risk Management ("ERM")

22  Committee.[3]  Gramley is a resident of Maryland.

23

24

---

25  [3]    By its Charter, the ERM Committee was responsible for assisting Bancorp's full Board in the
    performance of its duty to oversee: (i) the actions of Bancorp management in implementing
26  Bancorp-wide risk management policies and strategies, (ii) risk management activities, and (iii)
    the risk condition of Bancorp.  Until early 2005, the ERM Committee was known as the "Board
27  Asset Liability Management Committee."

28                                          - 8 -

COMPLAINT WITH OBJECTIONS AND COUNTERCLAIMS TO DEFENDANTS' CLAIMS

25.     Defendant Hugh M. Grant ("Grant") served as a director of Bancorp from at least January 2004 until July 2008.  From 2004 through 2008, Grant chaired the Board's Audit Committee.[4]  Grant is a resident of California.

26.     Defendant Patrick C. Haden ("Haden") served as a director of Bancorp from at least January 2004 until July 2008.  Haden is a resident of California.

27.     Defendant Terrance G. Hodel ("Hodel") served as a director of Bancorp from at least January 2004 until July 2008.  From 2004 through 2008, Hodel served on the Board's ERM Committee.  Hodel is a resident of California.

28.     Defendant Robert L. Hunt II ("Hunt") served as a director of Bancorp from at least January 2004 until July 2008.  From 2004 through 2008, Hunt served on the Board's Audit Committee, and, during that same time period, Hunt chaired the Board's ERM Committee.  Hunt is a resident of California.

29.     Defendant Lydia H. Kennard ("Kennard") served as a director of Bancorp from January 2007 until July 2008.  Kennard is a resident of California.

30.     Defendant Bruce G. Willison ("Willison") served as a director of Bancorp from July 2005 until July 2008.  From 2006 through 2008, Willison served on the Board's Audit Committee, and, from 2005 through 2006, he served on the Board's ERM Committee.  Willison is a resident of California.

31.     Each of the aforementioned Defendants, by virtue of his or her status as a Director of Bancorp, owed fiduciary duties to Bancorp, including, but not limited to, the duty of care, duty of loyalty, duty of good faith, and duty to oversee and manage.

---

[4]     By its Charter, the Audit Committee was responsible for assisting Bancorp's full Board in the performance of its duty to oversee:  (i) the integrity of Bancorp's financial statements, reports and other financial information reported to stockholders and others; (ii) the performance of Bancorp's internal audit function; (iii) Bancorp's compliance with legal and regulatory requirements; and (iv) the qualification and performance of Bancorp's independent auditors.

COMPLAINT WITH OBJECTIONS AND COUNTERCLAIMS TO DEFENDANTS' CLAIMS

**C.    Defendants' Proofs of Claim**

32.    On November 24, 2008, Perry filed a Proof of Claim in this Court against the Chapter 7 bankruptcy estate of the Debtor for unpaid prepetition compensation, termination damages, and indemnification.[5]

33.    On November 26, 2008, Gramley, Haden, and Willison each filed a Proof of Claim in this Court against the Chapter 7 bankruptcy estate of the Debtor for deferred compensation.[6]

34.    On November 26, 2008, Caldera, Grant, Hodel, Hunt, and Kennard each filed a Proof of Claim in this Court against the Chapter 7 bankruptcy estate of the Debtor for indemnification rights.[7]

**IV.    FACTUAL ALLEGATIONS**

**A.    The Bank's Formation and Collapse and Bancorp's Bankruptcy**

35.    On or about January 1, 2000, Bancorp converted to a fully-taxable, growth-oriented depository institution.  Later that year, on July 1, Bancorp acquired SGV Bancorp, Inc. and its subsidiary savings association into which Bancorp contributed substantially all of its assets and operations and which Bancorp renamed IndyMac Bank, F.S.B.

36.    Bancorp's mortgage banking operations, rooted in the Bank, were focused on producing, selling, servicing, and purchasing securitized pools of predominately Alt-A single-family mortgage loans.  Bancorp, again predominantly through the Bank, also originated, sold, and serviced subprime mortgage loans as well as loans with non-traditional or exotic features, including,

---

[5]    A true and correct copy of Perry's Proof of Claim is attached hereto as Exhibit 3.

[6]    True and correct copies of Gramley, Haden, and Willison's Proofs of Claim are attached hereto as Exhibit 4.

[7]    True and correct copies of Caldera, Grant, Hodel, Hunt, and Kennard's Proofs of Claim are attached hereto as Exhibit 5.

COMPLAINT WITH OBJECTIONS AND COUNTERCLAIMS TO DEFENDANTS' CLAIMS

for example, Option Adjustable Rate Mortgage ("Option ARM") loans, 100%
LTV (loan-to-value) loans, Teaser or Introductory rate loans, and Closed End
Second loans.  In addition, Bancorp's thrift invested in single-family residential
mortgage assets, whole loan and mortgage-backed securities, and sold mortgage
loans through private label securitization.

37.     Given the Bank's heavy production focus on high-risk mortgage
loans, for which the secondary market evaporated over the course of 2007, it was
unable to securitize and sell billons of dollars of mortgage loans in late 2007.

38.     In early January 2008, the OTS conducted an examination of
Bancorp and the Bank.  Within weeks, the OTS expressed serious concern
regarding, among other issues, the Bank's capital adequacy and downgraded its
composite CAMELS rating from a "2" to a "3."  Within six months, the OTS
repeatedly and belatedly downgraded the Bank's CAMELS ratings, and even
sought a consent order to address the Bank's unsafe and unsound banking
practices.  Bancorp's performance declined precipitously, with heavy losses
causing it to defer interest payments on certain preferred securities and suspend
dividends on common shares for the first quarter of 2008.

39.     On July 11, 2008 (the "Receivership Date"), the OTS closed the
Bank.  On July 17, 2008, the OTS appointed the FDIC as the receiver of the Bank
and conservator of the IndyMac Federal Bank, F.S.B., the entity into which
substantially all of the Bank's assets were immediately transferred.

40.     On July 31, 2008 ("Bankruptcy Petition Date"), Bancorp filed for
Chapter 7 bankruptcy protection, initiating the Bankruptcy Case.

41.     On August 4, 2008, Plaintiff was appointed the Interim Chapter 7
Trustee in the Bankruptcy Case.

42.     By order entered on December 11, 2008, Plaintiff was confirmed as
permanent Chapter 7 Trustee in the Bankruptcy Case.

- 11 -

COMPLAINT WITH OBJECTIONS AND COUNTERCLAIMS TO DEFENDANTS' CLAIMS

1

**B.**    **The Treasury Report**

2      43.    On February 26, 2009, the OIG issued the Treasury Report.  The

3  Treasury Report was based on four months of investigative fieldwork and

4  presented the results of the OIG's review of the failure of IndyMac Bank and the

5  supervision of the Bank by the OTS.  The OIG prepared the report by reviewing

6  the OTS supervisory files and records for the Company dating back to 2000,

7  reviewing Company documents in the custody and control of the FDIC, and

8  interviewing "key [Company] officials involved in the regulatory, supervisory,

9  and enforcement matters."  The OIG also conducted fieldwork at the Company's

10  headquarters in Pasadena, California, reviewing Bank records and interviewing a

11  number of former Bank employees.

12      44.    As discussed, the Treasury Report discussed the significant capital

13  inadequacy at the Bank in 2008, including the FDIC's liquidity analysis indicating

14  that the Bank needed billions in further capital to avoid failure.   The Treasury

15  Report further concluded that the primary cause of the Bank's capital

16  inadequacies and its failure was its business strategy of originating and

17  securitizing Alt-A loans on a large scale.  According to the Treasury Report,

18  "[t]his strategy resulted in rapid growth and a high concentration of risky assets."

19  The Treasury Report noted that "IndyMac often made loans without verification

20  of the borrower's income or assets, and to borrowers with poor credit histories.

21  Appraisals obtained by IndyMac on underlying collateral were often questionable

22  as well."

23

**C.**    **The Backdating Report**

24      45.    On May 21, 2009, the OIG issued the Backdating Report.  The

25  Backdating Report presented the results of the OIG's review of the OTS's

26  involvement in the backdating of capital contributions at certain thrifts, including

27  IndyMac Bank.  As Paragraphs 53-63 describe more fully, the Secretary of the

28

COMPLAINT WITH OBJECTIONS AND COUNTERCLAIMS TO DEFENDANTS' CLAIMS

1  Treasury requested that the OIG open the inquiry after the OIG became aware of a

2  work paper of Bancorp's independent auditor Ernst & Young, LLP ("E&Y") that

3  showed Bancorp made an $18 million capital contribution on May 9, 2008 that it

4  then backdated to the quarter ending on March 31, 2008.

5      46.    To prepare the Backdating Report, the OIG conducted fieldwork

6  from September 2008 through May 2009.  With respect to its review of the

7  backdating by Bancorp, the OIG, among other efforts, interviewed E&Y auditors,

8  reviewed E&Y workpapers, reviewed documentation that the OTS obtained as to

9  the circumstances surrounding the backdated capital contributions, interviewed

10 the relevant OTS officials responsible for supervision of Bancorp, defined and

11 analyzed the accounting authorities and available supporting guidance relating to

12 the accounting treatment of capital contributions, and discussed this accounting

13 guidance with officials from the OTS, the Financial Accounting Standards Board

14 ("FASB"), the FDIC, the SEC, and the Officer of the Comptroller of the Currency.

15     47.    In the Backdating Report, the OIG, among other things, concluded

16 that Bancorp's backdating of the $18 million from May 9, 2008 to March 31,

17 2008 was improper and should not have been included in Bancorp's March 31,

18 2008 Thrift Financial Report ("TFR").

19     **D.    Allegations Related Solely to Events in 2008**

20     48.    Including the transfer discussed in the Backdating Report, during

21 2008, the Defendants directly injured Bancorp by facilitating or otherwise failing

22 to avoid significant capital contributions by Bancorp to the Bank when those

23 contributions did nothing other than perpetuate for a very short time a business

24 already destined for failure.

25     49.    During the same time period, the Defendants were or should have

26 been aware that Bancorp desperately needed to raise capital.  As detailed in the

27 Treasury Report and discussed herein, Bancorp had an acute need for additional

28

- 13 -

COMPLAINT WITH OBJECTIONS AND COUNTERCLAIMS TO DEFENDANTS' CLAIMS

1  regulatory and other capital by early 2008.  As noted, the March 2008 FDIC

2  liquidity analysis concluded that the Bank would likely fail, unless Bancorp raised

3  up to $3.5 billion.  Despite the fact that the Defendants all were or should have

4  been aware that the Bank needed to raise massive amounts of capital in order to

5  survive, the Director Defendants breached their duties to Bancorp by failing to

6  adequately oversee and provide direction over management's meager efforts to

7  raise capital.

8       50.    Specifically, the Director Defendants breached their duties to

9  Bancorp by failing to provide any Board-level direction whatsoever to senior

10  management on the critical issue of raising capital.  In fact, the Defendants took

11  no formal action at the Board level ***until April 24, 2008***, when the Defendants

12  finally formed a Capital Committee to consider potential investments.

13       51.    In addition to failing to take appropriate Board-level governance

14  action related to raising capital, the Director Defendants abdicated their

15  responsibility to provide meaningful oversight of management's activities in this

16  regard.  Such lack of oversight is especially significant given senior

17  management's failure to pursue prudently outside capital.  For example, despite

18  Bancorp's dire need for capital in early 2008, Perry refused to meet with potential

19  private equity investors (including BlackStone, Carlyle Group, and Cerberus) in

20  both January and late February—even though Bancorp's investment advisor had

21  pre-arranged the January meetings and then pushed to have them placed back on

22  the calendar in late February—on the grounds that (in January) he did not want to

23  pursue mere "exploratory meetings," and that (in February) he

24  "really [did not] have much time" for the meetings, did not "like the idea of

25  'going to them [the potential investors]' anyway," and generally—despite

26  Bancorp's dire straights—did not want it, or perhaps himself, to appear "weak" or

27  "distressed" to investors.

28

- 14 -

COMPLAINT WITH OBJECTIONS AND COUNTERCLAIMS TO DEFENDANTS' CLAIMS

52.   The Director Defendants' abdication of responsibility with respect to raising capital and overseeing downstream transactions, along with the Defendants' disregard of red flags throughout 2008 and before, placed Bancorp in perilous financial condition.  Indeed, given Bancorp's extremely weak financial condition, and in light of the fact that the Bank was virtually guaranteed to fail absent a massive capital influx, the meager-by-comparison capital contributions that were made in 2008 served no purpose other than to deplete Bancorp's assets with no corresponding benefit to the Bank or any other entity.

### 1.   May 2008 Backdating of $18 Million of a $50 Million Capital Contribution

53.   As discussed in the Backdating Report, a particularly egregious example of these downstream transfers occurred when, in an effort to obscure the Bank's non-compliance with required Risk-Based Capital Ratios, the Defendants authorized an unusual $50 million mid-quarter capital contribution from Bancorp to the Bank on May 10, 2008 and then improperly backdated $18 million of the transaction to March 31.

54.   The $50 million capital contribution was unusual not only because of the improper backdating, but also because it was unprecedented for Bancorp to make a distribution to the Bank in the middle of a quarter.  This episode illustrates the extent to which Perry and the Director Defendants were acting against Bancorp's best interest, going so far as to backdate contributions in a misguided effort to delay the Bank's inevitable failure.  Importantly, at no time did Perry and the other Defendants pose the fundamental question that, as officers and directors of Bancorp, they were required to ask—namely, whether Bancorp's infusion of $50 million into the Bank at such a late date was in Bancorp's best interests.  As a result, the Defendants caused Bancorp to transfer this sum less than two months

- 15 -

COMPLAINT WITH OBJECTIONS AND COUNTERCLAIMS TO DEFENDANTS' CLAIMS

1  before the Bank failed and, in doing so, sought to disguise the timing and purpose

2  of the transfer.

3      55.    Indeed, at the time this transfer was authorized, the Defendants knew

4  and deliberately or recklessly disregarded that the amount transferred, including

5  the amount backdated, had no chance whatsoever to prevent the Bank's failure

6  and would serve merely to deplete the cash of Bancorp.

7      56.    As noted above, the specific facts and circumstances surrounding this

8  improper, imprudent, and reckless backdating transaction, prompted an OIG audit

9  culminating in the adverse findings detailed in the Backdating Report and

10  described below.

11      57.    On or around May 1, 2008, the Bank filed its report pursuant to the

12  TFR process, noting its Risk-Based Capital was 10.15%.

13      58.    During the week of May 5, 2008, however, Bancorp's senior

14  management and certain third-party professionals, including, but not limited to,

15  Dayton Lierley and Andrew Mokhov at E&Y, Bancorp's independent auditor,

16  discussed certain first quarter 2008 adjustments that, together with fourth quarter

17  2007 adjustments, would have resulted in the Bank having Risk-Based Capital of

18  9.98% (two basis points below "Well-Capitalized").  After some efforts to

19  dissuade the professionals at E&Y that these adjustments were necessary, on or

20  around May 9, 2008, the Defendants agreed that they were required.

21      59.    As a last-ditch effort to avoid non-compliance with the required

22  Risk-Based Capital ratios, on May 9, 2008, Bancorp's senior management,

23  including Perry, determined that one possible way to avoid this result would be to

24  backdate $18 million of an upcoming $50 million capital contribution from

25  Bancorp to the Bank to March 31, 2008 on the grounds that Bancorp had

26  approximately $18.3 million in cash as of March 31, 2008.

27

28                          - 16 -

60.     Later that day, following discussions with Bancorp senior managers, including Perry, both E&Y and the OTS acceded to Bancorp's request to backdate $18 million of the upcoming $50 million capital contribution, notwithstanding that, as the Backdating Report concluded, both the proposed backdating and any third-party accession thereto were improper.

61.     On May 10, 2008, the Board's Audit Committee, without an appropriate inquiry into the propriety of the backdating transaction or its impact on Bancorp, improperly approved it.

62.     By allowing this improper transaction, the Defendants breached their fiduciary duties to Bancorp.

63.     On May 12, 2008, as a result of breaches by the Defendants, the Bank filed an amended TFR that inaccurately reported Risk-Based Capital of 10.26% as of March 31, 2008.

## 2.    March 31, 2008 Downstream Transfer of $70 Million to Bancorp's Detriment

64.     In addition to the backdated transaction discussed above, during 2008, Bancorp downstreamed other significant amounts of capital from itself to the Bank, thereby depleting the assets of Bancorp.  In total, including the $50 million transfer on May 9, 2008 discussed above, during 2008, Bancorp downstreamed at least $120 million (the "2008 Identified Transfers").  The Trustee is informed and believes and hereby alleges that there may be additional improper transfers during 2008 to or for the benefit of the Bank and/or its direct and indirect subsidiaries that the Trustee has been unable to discover to date (together, with the 2008 Identified Transfers, the "2008 Downstream Transfers").

65.     On the dates the 2008 Downstream Transfers were made, and even after giving effect to them, the Bank was failing as an institution absent massive changes in business practices that the Defendants simply failed to make and

- 17 -

absent billions in outside capital that they failed to raise.  The 2008 Downstream

Transfers did nothing other than briefly defer the Bank's inevitable collapse,

resulting in an utter waste of Bancorp's capital.  The Defendants repeatedly

violated their duties of loyalty and care to Bancorp, while benefiting the Bank at

Bancorp's expense.  Just as with the improper backdating transaction, the

Defendants abdicated their responsibility to oversee management and recklessly

disregarded red flags in allowing the 2008 Downstream Transfers to occur.

66.     Bancorp's officers regularly executed the 2008 Downstream

Transfers without the required approval from the Defendants, who were typically

informed of such transfers after the fact and failed in, among other things, their

duty to oversee such capital contributions, safeguard Bancorp's assets, and ensure

Bancorp's liquidity.

67.     In particular, the Defendants failed to adhere to the Company's ERM

Policy which, at least as far back as February 28, 2006 and until at least May 21,

2008, stated that "the Board of Directors of the Holding Company and the Board

of Directors of the Bank **must approve 'down streaming' of capital to the bank.**"

(Emphasis added.)

68.     Furthermore, as detailed more fully in Paragraphs 202-203 and 211-

213, in multiple instances during 2008, the 2008 Downstream Transfers caused

Bancorp to violate its corporate policies and procedures, including, but not limited

to, Bancorp's Liquidity Policy, which required Bancorp to maintain liquid assets

equal to 12 months of projected cash outflows for stock dividends and interest

payments on unsecured debt.

69.     Evidence of such breaches by Bancorp of its Liquidity Policy in or

around 2008 includes, but is not limited to, the following: In a March 20, 2008 e-

mail to Keys and Perry, Bancorp's Treasurer expressed concern about a possible

violation of the Liquidity Policy, writing that he "feel[s] uncomfortable with the

- 18 -

$75 million capital infusion to the Bank before quarter[s] end" given Bancorp's liquidity issues.  The Treasurer added that, because Bancorp only had $75 million in cash to contribute, it would have to raise significant additional capital to cover certain of its basic expenses and that downstreaming the proposed amount could make raising such capital more difficult because it creates the appearance that the "Holding Company is having liquidity problems."  Ultimately, notwithstanding the Treasurer's concerns and as described below, Bancorp downstreamed $70 million at the end of the first quarter of 2008, triggering—as the Treasurer feared—a violation of the Liquidity Policy (putting the ratios out of compliance by more than $26 million and causing the ERM Committee Defendants to conclude that Bancorp would, as a result of the transfer, "remain[] out of compliance . . . throughout the remainder of 2008.")

70.     The Defendants failed to keep themselves adequately informed of the nature of the 2008 Downstream Transfers and their impact on Bancorp or to respond to repeated notices of these breaches of Bancorp's Liquidity Policy.

71.     Moreover, to the extent the Defendants were informed of, or otherwise authorized, these 2008 Downstream Transfers, they acted against the interest of Bancorp in favor of the Bank and depleted the assets of Bancorp with no corresponding benefit to Bancorp.

72.     The imprudence and impropriety of the 2008 Downstream Transfers are evidenced by, among other things, the fact that the Defendants failed to ensure (as discussed, in part, in Paragraphs 135-185) that Bancorp raised sufficient capital to prevent the Bank's failure.

73.     Indeed, as noted, the March 2008 Treasury Report showed the Bank needed up to $3.5 billion in additional capital to avoid failing.  This amount, which exceeds the total amount of the 2008 Downstream Transfers by over $3.3 billion, demonstrates that the 2008 Downstream Transfers could not have

- 19 -

COMPLAINT WITH OBJECTIONS AND COUNTERCLAIMS TO DEFENDANTS' CLAIMS

1  prevented the Bank's failure and that, instead, they served merely to deplete

2  Bancorp's cash.

3      74.    In addition to the FDIC liquidity analysis, the Defendants had

4  numerous early 2008 communications that evidence their recognition of

5  Bancorp's poor financial condition including:

        (a)    January 9, 2008 Joint Bancorp and Bank Board
6                  Special Meeting Minutes memorializing a
7                  discussion among the Defendants on capital
                raising and the risk of a run on the Bank in which
8                  Perry warns that Bancorp cannot count on raising
                any capital due, in part, to the poor market
9                  performance of Bancorp's stock.

10          (b)    The fact that, on or around February 8, 2008,
                Perry described Bancorp to an outside investor as
11                  "literally fighting for" its life.

12          (c)    The fact that, as early as March 21, 2008, the
                Bank, at the OTS's suggestion, and in recognition
13                  of its precarious state, began consideration of a
                good bank / "bad bank" strategy.
14

15          (d)    The fact that, as early as March 25, 2008, Perry
                acknowledged the need to prepare for discussions
16                  with the Company's senior managers about
                "'what happens to them' . . . if . . . the worst
17                  happens and we ultimately fail."

18          (e)    Perry's admission on April 15, 2008 to the OTS
                that he was "not optimistic at this point" about
19                  how "realistic a significant capital raise will be."

20      75.    Despite Bancorp's perilous financial condition and capital needs at

21  the Bank that could only be met by outside investment, Bancorp proceeded to

22  downstream $70 million to the Bank on March 31, 2008 (the close of the first

23  quarter of 2008), and downstreamed $50 million on May 9, 2008 ($18 million of

24  which was backdated to March 31, 2008 from May 9, 2008).

25      76.    Bancorp received no consideration or grossly inadequate

26  consideration for most, if not all, of the 2008 Downstream Transfers.

27

28                              - 20 -

COMPLAINT WITH OBJECTIONS AND COUNTERCLAIMS TO DEFENDANTS' CLAIMS

77.    Indeed, as a result of the Defendants' abdication of responsibility and disregard for red flags, Bancorp incurred damages equal to, at a minimum, the total amount of the 2008 Downstream Transfers, plus the value of any other assets—both tangible and intangible—that Bancorp lost as a result of the OTS's seizure of the Bank and Bancorp's subsequent bankruptcy petition.

**E.    Additional Allegations**

**1.    2007 Downstream Transfers to Bancorp's Detriment**

78.    In addition to the 2008 Downstream Transfers discussed in Section D above, during the last half of 2007, after it became clear that the Bank was no longer viable absent capital infusions which Bancorp could not provide on its own, Bancorp downstreamed considerable amounts of capital from itself to the Bank, thereby depleting the assets of Bancorp.  During 2007, Bancorp downstreamed at least $235 million (the "2007 Identified Transfers").  Specifically, Bancorp downstreamed  $175 million on September 27, 2007 (the close of the third quarter of 2007), and $60 million on December 21, 2007 (the close of the fourth quarter of 2007).

79.    The Trustee is informed and believes and hereby alleges that there may be additional improper transfers during 2007 to or for the benefit of the Bank and/or its direct and indirect subsidiaries that the Trustee has been unable to discover to date (together with the 2007 Identified Transfers, the "2007 Downstream Transfers").

80.    Some or all of the 2007 Downstream Transfers occurred because of the Defendants' concern about maintaining certain Risk-Based Capital ratios with respect to the Bank, irrespective of Bancorp's own interests, capital needs and financial condition.  During 2007 and despite such capital contributions, senior management at both Bancorp and the Bank acknowledged significant concerns about the Bank's liquidity and capitalization.  Bancorp's senior management also

- 21 -

expressed a lack of confidence in the Bank's profitability, acknowledging that

Bancorp's stock price was declining and that the Bank needed to cut operating

costs.  The 2007 Downstream Transfers, therefore, did not slow the Bank's

inevitable collapse and wasted completely Bancorp's capital.  Thus, the

Defendants repeatedly violated their duties of loyalty and care to Bancorp, while

benefiting the Bank at Bancorp's expense.

81.    Bancorp's officers regularly executed the 2007 Downstream

Transfers without the required approval from the Defendants, who failed in,

among other things, their duty to monitor such capital contributions, protect

Bancorp's assets, and ensure Bancorp's liquidity.

82.    Moreover, as set forth in full detail in Paragraphs 202-203 and 208-

213, in multiple instances during 2007, the 2007 Downstream Transfers caused

Bancorp to violate its corporate policies and procedures, including, but not limited

to, Bancorp's Liquidity Policy, which required Bancorp to maintain liquid assets

equal to 12 months of projected cash outflows for stock dividends and interest

payments on unsecured debt.  Evidence of such breaches by Bancorp of its

Liquidity Policy in or around 2007 includes, but is not limited to, the following:

(a)    On March 8, 2007, the OTS presented Bancorp's Treasurer with a memorandum detailing five separate violations of the internal Liquidity Policy, all of which occurred during 2006.

(b)    Bancorp Board of Directors Regular Meeting Minutes dated October 30, 2007 memorialize that Keys described the circumstances surrounding Bancorp's "dip" below the Liquidity Policy requirement by $33.8 million due to a $175 million capital contribution to the Bank along with a breach of a profitability covenant that resulted in Bancorp being unable to access a $75 million line of credit.

- 22 -

COMPLAINT WITH OBJECTIONS AND COUNTERCLAIMS TO DEFENDANTS' CLAIMS

83.    The Defendants failed to keep themselves adequately informed of the nature of the 2007 Downstream Transfers and their impact on Bancorp or to respond to repeated notices of these breaches of Bancorp's Liquidity Policy.

84.    Moreover, to the extent the Defendants were informed of, or otherwise authorized, the 2007 Downstream Transfers, they acted against the interest of Bancorp in favor of the Bank and depleted the assets of Bancorp with no corresponding benefit to Bancorp.

85.    Indeed, the imprudence and impropriety of the 2007 Downstream Transfers are evidenced by, among other things, the fact that the Defendants failed to ensure (as discussed, in part, in Paragraphs 135-185) that Bancorp raised sufficient capital to prevent the Bank's failure.

86.    Bancorp received no consideration or grossly inadequate consideration for most, if not all, of the 2007 Downstream Transfers.

87.    As a result of the 2007 Downstream Transfers, and the corresponding abdication of responsibility and disregard of red flags by the Defendants, Bancorp incurred damages equal to, at a minimum, the total amount of the 2007 Downstream Transfers, plus the value of any other assets—both tangible and intangible—that Bancorp lost as a result of the OTS's seizure of the Bank and Bancorp's subsequent bankruptcy petition.

## 2.    The Defendants' Abdication of Responsibility and Decision-Making and Failure to Supervise Management

88.    The Director Defendants breached their fiduciary duties to Bancorp by (a) allowing Perry and other Bancorp and Bank managers to make and execute important Board-level strategic decisions without seeking their consultation or approval; (b) failing to provide even a minimal level of oversight regarding Bancorp's deteriorating financial condition; (c) generally failing to question Perry's leadership, even when it became abundantly clear that Bancorp was

- 23 -

COMPLAINT WITH OBJECTIONS AND COUNTERCLAIMS TO DEFENDANTS' CLAIMS

headed toward insolvency and the Bank toward failure; (d) acting in the interests of the Bank as opposed to the best interests of Bancorp, and (e) acquiescing in business strategies and actions that sacrificed the interests of Bancorp in a failed effort to preserve the Bank.

89.    As detailed in the following Paragraphs, Perry—contrary to Bancorp policy which the Defendant Directors deliberately and/or recklessly failed to enforce—did not seek the Director Defendants' approval before authorizing downstream transfers or making other significant decisions on behalf of Bancorp. To Bancorp's detriment, the Director Defendants remained supportive of management and of Perry, if not subservient to it and to him.  Amazingly, at no time—even after Perry himself suggested it—did the Director Defendants actively consider whether to replace Perry as CEO, despite the relentlessly negative financial data reported each quarter and dating back to 2005.  In fact, the Director Defendants rarely questioned Perry's judgment at all.  The few times a Director Defendant did question him, Perry's immediate and extreme anger usually prompted that Defendant to offer a speedy apology and sycophantic words of encouragement.

90.    With the Director Defendants merely corporate 'window dressing,' Perry was able to execute his own deeply flawed strategy for Bancorp and the Bank, resulting in the failure of both institutions.

### (a)    The Defendants' "Disdain for Corporate Governance"

91.    As described above, the Director Defendants consistently deferred to Company management—especially to Perry.  This was especially true after Perry, in 2006, showed his determination to attack and remove from the Board those who did not.

- 24 -

COMPLAINT WITH OBJECTIONS AND COUNTERCLAIMS TO DEFENDANTS' CLAIMS

92.    For example, one former Board member, James Ukropina, whose outspokenness and questioning of management decisions had created friction with Perry, was asked to resign from the Board.  Ukropina, a former partner at O'Melveny & Myers LLP and current Presiding Director of Lockheed Martin Corp., served on the Boards of Bancorp and the Bank from February 2001 through April 2006.

93.    Perry disliked Ukropina's active approach to Board membership.  In Perry's words, "[m]anagement, in my and my team's view, is spending an inordinate amount of time devoted to 'board process,'[] taking away from their primary duty of running the company."

94.    The conflict between Perry and Ukropina escalated in February 2005.  On February 3, 2005: Perry wrote in an e-mail to Ukropina that "[i]t is my strong view that our board is continually going 'over the line' with respect to process . . . ."

95.    Ukropina replied, copying the full Bancorp and Bank Boards, noting that the market capitalization of Bancorp had nearly doubled in the last three years, and stating that "[i]n my humble opinion, you and your team should reasonably expect not less but more board involvement given that growth."

96.    On February 16, 2005, a meeting was held between Perry and Director Defendants Grant and Haden to discuss Director Ukropina.  In talking points prepared for the meeting, Perry noted that Ukropina "has a bias that boards are good/right and management may not be."  The talking points note that Ukropina could "choose 'not to stand' for re-election" to the Bancorp and Bank Boards rather than resign—evidencing Perry's intent to have Ukropina removed from the Board.

97.    Shortly after the February 16 meeting, a meeting was held between Ukropina and Defendants Perry, Grant, and Haden, at which Ukropina, according

- 25 -

COMPLAINT WITH OBJECTIONS AND COUNTERCLAIMS TO DEFENDANTS' CLAIMS

1  to Perry, "went out of his way to be conciliatory."  It was agreed that Ukropina

2  should stay on as a Bancorp and Bank Board member, but Ukropina agreed to

3  step down as presiding director.

4       98.    The conflict between Perry and Ukropina continued, however.  On

5  October 18, 2005, Perry wrote a letter to Director Defendant Grant regarding his

6  "continued concern that our independent board has been swayed towards a culture

7  that is too focused on process and director liability, which is leading to an

8  unnecessary and unproductive burden on both the board and management."  Perry

9  cited an example from a recent board meeting at which Ukropina had requested

10  that Alston & Bird (corporate counsel to Bancorp) draft a memorandum on an

11  issue related to director liability and CEO compensation after, according to Perry,

12  outside counsel had already provided the Board with an e-mail summary of the

13  issue.  Perry wrote:

14      Hugh, I need your help and support, as Presiding Director, in reining in Jim
15      or any director who is overemphasizing process and director liability to the
    detriment of board and management effectiveness.

16      While I know that Jim means well, I am concerned that his 'sway' over the
17      board is making the board less effective than it otherwise would be.

18       99.    A January 20, 2006 memorandum by Dwight Smith of Alston & Bird

19  noted that "by mutual agreement between Jim Ukropina and IndyMac Bancorp,"

20  Ukropina will not be re-nominated to the Bancorp and Bank Boards.  The

21  memorandum noted a number of "circumstances surrounding Mr. Ukropina's

22  [r]etirement," including that Ukropina "appears to have urged greater board

23  involvement in the management of IndyMac," while "[t]he other directors

24  involved (including the Chairman) appear to have disagreed . . . ."

25       100.   On or about January 24, 2006, Ukropina announced that he would

26  retire from the Bancorp and Bank Boards.  His retirement was effective as of

27  April 25, 2006.

28                           - 26 -

101.   Prior to his retirement date, on March 27, 2006, Ukropina wrote a Memorandum titled "Report about Concerns regarding Company Governance Practices and Related Matters."  This Memorandum was circulated to all Board members.  In the Memorandum, Ukropina wrote:

> ***I perceive that the CEO has a significant disdain for corporate governance, in general, and, in particular, for directors who may advocate appropriate director independence and who may focus on shareholder rather than management interests.***  The complexity of these issues is heightened by the CEO's own pronounced interest in shareholders (e.g., 'I am supportive of greater board involvement'), while seemingly discouraging directors who seek to protect those interests.  In this regard, I point to the recent adoption of a highly unusual and restrictive policy with respect to directors who request additional corporate information before they make what they want to be a prudent decision or before they conduct their oversight duties.
>
> In response to this concern, one director said to me, 'I think the CEO gives us everything we ask for.'  That may be the case, but note that, unlike the practices for other boards on which I sit, for large and small companies, directors often ask the company's CEO for some additional information or analysis other than what is supplied.  In my opinion, the recent lack of requests for further information or analysis is a product of the perceived attitude of the CEO.  (Emphasis added.)

102.   On March 31, 2006, Perry responded to Ukropina's Memorandum in an e-mail to Rayman Mathoda, Executive Vice President ("EVP") and Chief People and Efficiency Officer for Bancorp.  Perry described that the "last straw" for him with respect to Ukropina had come when Director Defendant Grant told Perry that some of the directors took issue with a memorandum drafted by Alston & Bird which they felt was too biased toward management.  Perry believed that Ukropina had instigated the dissent.  Perry wrote:

> After discussing this issue with other managers, I determined that it was now time to take a firmer stand about Jim.  We felt strongly and still do that Jim has been a 'cancer' for our board that has influenced a few other directors in a negative way.  As a result, I made clear to Hugh and Pat that I felt Jim had violated our verbal agreement and it was time for him to go, yet I still felt little to no support for this position from either of them.  As a result of their continued lack of support, I was forced to make clear to them that I had no intention of negotiating a contract with Jim or anyone, as long as Jim was still on IndyMac's board.

- 27 -

COMPLAINT WITH OBJECTIONS AND COUNTERCLAIMS TO DEFENDANTS' CLAIMS

103.   The Corporate Governance Committee of Bancorp's Board met on April 25, 2006, to address Ukropina's Memorandum.  A Report was prepared, which concluded that the Board does not "lack[] an understanding of its duties" and was not "inhibited from performing its duties to the best of its abilities."  The Report also noted that the Board was "troubled that the letter unfairly attacks the CEO [] notwithstanding IndyMac's extraordinary success over the last several years."  With Ukropina removed from the Bancorp and Bank Boards, the remaining Director Defendants continued to play the role that Perry preferred for them—that of passive bystanders unwilling to be more than a "rubber stamp" for Perry's misguided strategies that included stripping Bancorp of every asset to prop up the Bank for a few additional months of survival that achieved nothing other than waste of Bancorp's assets.

104.   To ensure the Director Defendants continued their minimalist approach to oversight and management, Perry took opportunities to remind them of what would happen to them if they got in his way.

105.   For example, on March 15, 2007, General Counsel Jules Vogel ("Vogel") circulated a document retention memorandum to Company managers regarding a recently-filed securities class action suit.  Perry responded that Vogel's e-mail was "an incredibly poor piece of communication" that gave far too much weight to a "frivolous" lawsuit that did not even bear mention in Bancorp's public filings.

106.   Director Defendant Caldera responded to Perry by e-mail, noting that he understood how Perry felt about such "nuisance" lawsuits, but that "we have to take this thing very seriously in any case."  Caldera wrote:

> My personal advice to you on communications like that below is that while you can and should express your strong convictions regarding the merits of the suit, you should also clearly endorse the need to take this seriously, retain documents, cooperate fully with our counsel, etc. . . . Your communications must convey that you take very seriously our legal obligations under these

- 28 -

COMPLAINT WITH OBJECTIONS AND COUNTERCLAIMS TO DEFENDANTS' CLAIMS

1   circumstances . . .I hope you understand the spirit in which this is sent.  I
2   want you and us to be fully protected on the less than 1% chance this blows
    up into something bigger than it is today.

3   107.    Perry took offense to Caldera's mild criticism.  He replied, copying

4   the entire Bancorp and Bank Boards:

5   I apologize in advance for not keeping this e-mail to myself.  It is too
    important an issue.  Frankly, your e-mail below is incredibly disappointing to
6   me and to Richard [Wohl] and Scott [Keys] who I shared it with.  I expressed
    to John Seymour yesterday, that both Richard and I were disappointed by the
7   'loud silence' we have to-date received from our independent directors,
    regarding this suit.  It is insulting to management and really shows the very
8   poor state of affairs of corporate boards (which I had hoped had changed at
    Indymac, post-Jim Ukropina). . . .[W]e enter a rough patch for our industry
9   and Indymac (where Indymac is clearly outperforming almost everyone) and
    we get a frivolous shareholder suit . . .where Richard, Scott and I have been
10  personally named [] and the only thing you see fit to do is to give me a
    lecture on taking this matter more seriously and imply that I don't know how
11  to do my job after all of these years [] and allude that the independent board
    needs to take over the handling of this matter. . . . Given the current
12  environment, if any individual board member diverts our attention from these
    substantive issues [] I expect that our Board Governance Committee will
13  address this and resolve it promptly.

14  108.    Caldera wrote a subsequent e-mail apologizing "if I or any other

15  director has failed to convey our fullest support of you and the management team

16  either with respect to responding to this meritless lawsuit or for the outstanding

17  job you are doing leading our company at this extremely challenging time."

18  109.    After Perry's bullying, several Director Defendants rushed to express

19  their confidence in him.  On March 17, 2007, Director Defendant Hunt e-mailed

20  Perry in response to Caldera's apology e-mail, writing: "I hope this helps ease

21  some of the frustration and anger you and your team were feeling on Friday.  And

22  now for some input as part of my guidance role: Louis Caldera is NOT another

23  Jim Ukropina.  Jim's ego would not have let him write this apology to you and the

24  entire board."

25  110.    Also in response to Caldera's apology e-mail, Director Defendant

26  Hodel wrote to Perry: "I think the 'loud silence' results not from lack of

27

28                                          - 29 -

COMPLAINT WITH OBJECTIONS AND COUNTERCLAIMS TO DEFENDANTS' CLAIMS

1 confidence, but rather from complete confidence. . . . I'm sure the Board has

2 ultimate confidence in you and your senior managers."

3      111.   Perry's ability to dictate the Director Defendants' responses to

4 critical issues that affected Bancorp's bottom line further demonstrates

5 Defendants' breaches of their fiduciary duties.  Director Defendants utterly failed

6 to exercise independence and oversight as they abdicated their responsibilities and

7 continually deferred to Perry's management tactics in order to protect their

8 valuable positions as Bancorp directors.

9            **(b)   The Director Defendants Rubber-Stamped
            Defendant Perry and Other Officers' Cavalier
10            Attitude Toward Raising Much-Needed
            Capital**
11

12      112.   As set forth in Paragraphs 43-44 and 49 and as discussed in the

13 Treasury Report, Bancorp had an acute need for additional regulatory and other

14 capital.  By March 2008, the FDIC concluded that the Bank would likely fail

15 unless Bancorp raised as much as $3.5 billion.  Despite the fact that the

16 Defendants all were or should have been aware that the Bank needed to raise

17 capital in order to survive, the Director Defendants, in connection with this issue,

18 failed to discharge their duties to Bancorp in a number of ways.

19      113.   The Director Defendants improperly delegated their duties regarding

20 raising capital to Defendant Perry and his senior managers.  Without proper

21 oversight from the Director Defendants, Perry unilaterally decided whether

22 potential deals were pursued, left to languish, or even discussed with the Director

23 Defendants.

24      114.   Four examples of Perry's unilateral action include: (i) waiting over

25 three months to relay to the Board, in March 2007, MetLife's unsolicited interest

26 in an investment in Bancorp; (ii) failing, in August 2007, to relay the second set of

27 deal terms from Warburg Pincus LLC ("Warburg") to the Director Defendants for

28

COMPLAINT WITH OBJECTIONS AND COUNTERCLAIMS TO DEFENDANTS' CLAIMS

more than two months; (iii) refusing, in January 2008, to meet with potential
private equity investors, including BlackStone, Carlyle Group, and Cerberus, even
though Bancorp's investment advisor arranged the meetings, on the grounds that
he did not want to pursue mere "exploratory meetings"; and, (iv) refusing, in
February, 2008, to meet with prospective investors in New York, because he did
not "like the idea of 'going to them.'"

115.   Even in those instances when Director Defendants were informed of
potential capital-raising transactions, they failed to conduct any independent
assessment of those deals.  Indeed, the Director Defendants not only failed to
question or seek further information about possible capital raising opportunities
from management, but also failed to hire their own investment advisor (separate
and apart from any advisors hired by Bancorp).

116.   As set forth in Paragraph 50, the Defendants took no formal action at
the Board level *until April 24, 2008*, when the Board finally formed a Capital
Committee to consider potential investments.

117.   The aborted Warburg deal, among others, spotlights the Director
Defendants' hands-off approach to their corporate responsibilities.

118.   On March 29, 2007, after Perry e-mailed the Director Defendants
regarding a potential investment in Financial Freedom by Warburg in which Perry
outlined reasons to reject the proposed deal, Director Defendant Willison—with
no further analysis or input—replied in agreement that "keeping our powder dry
might be the best thing to do."

119.   Director Defendant Haden—again with no analysis and after no
deliberation among the Director Defendants—concurred, writing that "[I] believe
the private equity guys are a distraction at this point in time."

- 31 -

COMPLAINT WITH OBJECTIONS AND COUNTERCLAIMS TO DEFENDANTS' CLAIMS

120.    Director Defendant Hunt similarly agreed quickly and summarily with the plan to "stay the course."  He added: "The time to consider offers like this is when you are desperate."

121.    A few months later, the Director Defendants were equally disengaged from Perry's negotiations with Warburg regarding an equity investment in Bancorp.  On August 27, 2007, after Perry, by e-mail to the Director Defendants, explained the deal terms Warburg had proposed and noted that Bancorp (as distinct from the Board and the Director Defendants) was considering whether to retain Lehman Brothers and Wachtell, Lipton, Rosen & Katz, LLP to advise on the potential transaction, several directors immediately responded that they supported further exploration of the deal and thought a Board meeting to discuss the issue would be valuable.  However, this glimmer of corporate responsibility on the part of the Director Defendants quickly dissipated. After Director Defendant Gramley replied in quick succession to the earlier e-mails proposing a possible meeting by noting that although "this looks like a good deal . . . we don't need a [B]oard meeting at this point," discussions about holding a Board meeting to consider the Warburg investment halted.

122.    Indeed, on information and belief, the Director Defendants never held a Board meeting to discuss the Warburg investment.  Nor did they give further informal consideration to the specific terms of the pending proposal from Warburg.

123.    After relaying the terms to the Director Defendants, as set forth in more detail in Paragraphs 150-166, Perry had a complete reversal of opinion with respect to the Warburg investment.

124.    On September 6, 2007, Perry explained in an e-mail to Bank Director Gabrielle Greene that he canceled the previously scheduled Bancorp and Bank Board meeting to discuss the Warburg deal because his impression was that "most,

- 32 -

1  if not all directors agreed that [Bancorp] should not pursue the deal [with Warburg]

2  under the terms proposed." However, on information and belief, Perry had not

3  communicated with the vast majority of the Director Defendants about the

4  proposed terms.

5      125.    Subsequently, at a September 18, 2007 meeting of the Director

6  Defendants, Perry acknowledged the possibility that Bancorp could "see further

7  stress on our capital and liquidity," yet continued to dismiss the Warburg offer by

8  stating simply that it was "management's view . . . that the transaction was not in

9  the best interest of our shareholders[.]"

10     126.    According to the meeting minutes, after Perry summarily dismissed

11 the Warburg offer, the Director Defendants failed to ask a single question or

12 otherwise discuss the matter. The Defendants' approach to the Warburg proposal,

13 thus, exemplifies the Director Defendants' inappropriate and overly lax approach

14 to evaluating Bancorp's capital needs and realistic opportunities to meet them. By

15 failing to act and deferring to Perry, the Director Defendants neglected their

16 fiduciary duties to Bancorp.

17     127.    Another example of the Director Defendants' deference and passivity

18 came in October 2007, when they recklessly supported Perry's flat rejection of an

19 initial term sheet from Ares Capital Corp. (which, together with "Ares Capital

20 Management LLC" and "Ares Management LLC," is hereinafter "Ares"").

21 Affirming Perry's decision, Director Defendant Hunt responded: "I do not believe

22 that additional capital makes sense unless we are concerned about continuing

23 credit losses . . . or we are concerned that we will need to make room for more

24 illiquidity in the mortgage markets and the resulting balance sheet growth."

25     128.    As with the other proposals from potential investors, the potential

26 Ares deal died slowly in Perry's hands. As set forth in Paragraph 179, on

27 December 14, 2007, Bancorp informed Ares that it had a firm deadline of two

28

- 33 -

COMPLAINT WITH OBJECTIONS AND COUNTERCLAIMS TO DEFENDANTS' CLAIMS

1  weeks to submit new deal terms.  Ares apparently did not submit a further offer.

2  Perry attempted to renew contact with Ares in June 2008, but, by then and given

3  Bancorp's insolvency and the Bank's imminent failure, Ares had no interest.

(c)  <strong><u>The Director Defendants Provided<br>Unwavering Support of Defendant Perry and<br>Management</u></strong>

6  129.   The deference, inattentiveness, and irresponsibility the Director

7  Defendants showed in the capital raising context was, in part, driven by a

8  knowingly improper devotion to Bancorp's senior managers.

9  130.   For example, on October 7, 2007, Perry wrote to the Director

10 Defendants via e-mail to express that he was "re-thinking [his] view about

11 whether or not any senior managers 'need to be held to account and asked to

12 leave.'"  He added:

> I am a firm believer that the 'buck stops with the CEO' and that this
> quarter's loss is squarely my responsibility [] and I do feel that the board
> should have a healthy debate as to whether or not they believe that given
> this quarter and our reduced, near-term prospects [] I am the right person to
> lead IMB through this period and into the future.

16 131.   Director Defendant Gramley responded:

> The key sentence in this communication is the one that says '…in any
> environment like this, there is a lot of blame to go around.'  The [sic]
> includes the independent directors on the board as well as management at
> all levels of IMB.  ***Where were we, the independent directors, when the
> company let itself get caught up in the competitive relaxation of lending
> standards that developed in 2005-06?***
>
> There is simply no question in my mind that the board stands four square
> behind you.  We know you are the individual to lead this company in the
> months and years ahead.  That is not something the independent directors
> need to debate. (Emphasis added).

(d)  <strong><u>Failure to Consider or Properly Approve<br>Downstream Transfers</u></strong>

25 132.   As set forth in Paragraphs 66-77, Bancorp officers regularly

26 authorized downstream transfers from Bancorp to the Bank without seeking

27 approval from the Director Defendants, contrary to the Company's ERM Policy,

- 34 -

1  which was in place from at least February 28, 2006 through May 21, 2008 and

2  which required that "[t]he Board of Directors of the Holding Company and the

3  Board of Directors of the Bank *must approve 'down streaming' of capital to the*

4  *bank.*" (Emphasis added).  The Director Defendants, therefore, utterly failed to

5  oversee properly Perry and management's use of Bancorp's assets or otherwise

6  ensure that Bancorp maintained sufficient liquidity and was investing its resources

7  wisely.

8  133.  Due to the Defendants' complete disregard for the Company's Policy,

9  Perry and other officers had free rein to transfer hundreds of millions of dollars

10  from Bancorp to the Bank without meaningful oversight by the Director

11  Defendants to the detriment of Bancorp.  The Director Defendants' failure to

12  abide by the ERM Policy represents a breach of their fiduciary duties to Bancorp

13  and the Bank.

14  134.  As a result of the Director Defendants' abdication of responsibility,

15  Bancorp incurred damages equal to, at a minimum, the total amount of the

16  downstreamed funds during the relevant time period of such abdication plus the

17  value of any other assets—both tangible and intangible—that Bancorp lost as a

18  result of the OTS's seizure of the Bank and Bancorp's subsequent bankruptcy

19  petition.

**3.    Disregard for Opportunities to Raise Capital from Outside Investors**

**(a)    Overview**

23  135.  As discussed in Paragraphs 43-44 and 49 and in the Treasury Report,

24  beginning in mid-2007, the Company had an urgent and well-documented need

25  for additional regulatory and other capital.  By early 2008, the FDIC had

26  concluded that, for the Bank to survive, it needed as much as an additional $3.5

27  billion.  Notwithstanding the Company's critical capital needs, the Director

- 35 -

COMPLAINT WITH OBJECTIONS AND COUNTERCLAIMS TO DEFENDANTS' CLAIMS

1 Defendants improperly ignored and delegated their duties to pursue prudent

2 opportunities to raise such capital from outside investors and to sell Bancorp's

3 assets to Defendant Perry and his senior managers. As a result of the Director

4 Defendants' delegation, Perry was left without oversight, free to decide which

5 deals to pursue and which information to share with the Board. This, in turn,

6 caused Bancorp to miss critical chances to acquire the capital that could have

7 prevented the Bank's failure and Bancorp's insolvency.

8     136. Even when the Director Defendants knew details about potential

9 capital raising transactions, they conducted little or no independent due diligence

10 and followed management's lead in not properly pursuing outside capital to the

11 detriment of Bancorp.

12     137. As early as November 2007, the OTS recommended to senior

13 management that, based on the Bank's capital ratios, Bancorp needed to raise

14 outside capital. Long before that, in January of 2006, the OTS cautioned Bancorp

15 to closely monitor capital ratios at the Bank. For example:

16
17
18
        (a)    Bancorp Board Regular Meeting Minutes dated January 24, 2006, at which Director Defendants attended, noted that, although the OTS gave Bancorp a "2" rating, it recommended the level of tangible capital be monitored on a quarterly basis.

19
20
21
22
23
        (b)    November 2007 communications among senior managers at Bancorp noted that the OTS was growing concerned about the Company's capital levels and suggested Bancorp may need to raise significant outside capital. Indeed, no later than November 2007, senior management became aware that the OTS intended to downgrade the Bank's composite CAMELS rating from "2" to "3."

24
25
26
        (c)    Bancorp Board Meeting Minutes dated February 8, 2008 memorialized senior management's acknowledgement of the very real risk that the OTS could soon pressure Bancorp to raise dilutive capital.

27

28                                   - 36 -

COMPLAINT WITH OBJECTIONS AND COUNTERCLAIMS TO DEFENDANTS' CLAIMS

(d)    As predicted, on February 22, 2008, the OTS's Dochow e-mailed Perry stating that "[c]learly capital is thin . . . in light of the deteriorated asset quality" and suggests that Bancorp may need to raise capital more expeditiously.  Not surprisingly, Bancorp Board Meeting Minutes dated February 26, 2008 observed that Perry warned the Director Defendants that, given regulatory scrutiny and the risk that conditions could worsen, it "must be prepared to recapitalize the Company."

(e)    As noted in Paragraph 49, the FDIC determined in March 2008 that, to avoid failure, the Bank needed to raise up to $3.5 billion in additional capital.

138.    Indeed, by late 2007, the Defendants also began to acknowledge that Bancorp needed to raise capital.  For example:

(a)    On October 11, 2007, Bancorp (but not the Board itself) retained Morgan Stanley to advise on the aborted Mass Mutual transaction described in Paragraphs 172-174 below.

(b)    On December 20, 2007, Bancorp (but not the Board itself) retained JP Morgan to advise, generally, on proposed capital raising transactions.

139.    Notwithstanding such suggestions (and disregarding Bancorp's actual financial condition) and early internal recognition, until at least March 2008 (after it became clear the Bank's CAMELS rating would be downgraded), Perry and the other Defendants remained preoccupied with not "creat[ing] the impression" for the marketplace that Bancorp "ha[d] to raise capital." Accordingly, Perry and senior management 'killed' or otherwise allowed each of numerous sensible deals (as well as other, less-developed potential transactions) not to proceed without adequately consulting the Director Defendants.  Moreover, Perry and senior management repeatedly rejected opportunities to present Bancorp to potential new investors.  For example:

(a)    On November 16, 2007, in response to an e-mail from a senior banker who was updating Perry on further discussions with Mass Mutual regarding a

- 37 -

COMPLAINT WITH OBJECTIONS AND COUNTERCLAIMS TO DEFENDANTS' CLAIMS

potential investment in Bancorp, Perry simply replied: "You are annoying the hell out of me."

(b)    On January 4, 2008, Perry informed the Director Defendants and related parties that he did not want potential investors to conduct due diligence before submitting a term sheet because of concerns about how the marketplace would perceive Bancorp.

(c)    On January 10, 2008, Perry told the senior banker retained to advise Bancorp on potential investments that he was not interested in "exploratory meetings" with potential private equity investors, including BlackStone, Carlyle Group, and Cerberus, even though the banker had already arranged these meetings. These meetings were canceled.

(d)    On February 24, 2008, when the senior banker raised the issue of placing such meetings "back on the calendar," Perry dismissed the idea by explaining he "really [did not] have much time" for the meetings and did not "like the idea of 'going to them' anyway."

140.   When Perry and other officers did consult the Director Defendants about potential deals, the Director Defendants conducted little or no due diligence on those proposed transactions, including failing to retain or consult with outside experts. Moreover, Bancorp's senior managers (as distinct from the Board) also were derelict in their duty to engage advisors to assist with capital raising efforts. Indeed, Bancorp failed to engage investment advisors until months after considering and rejecting offers from, among other investors, Warburg and MetLife (and after deciding to simply ignore many other investment offers).

141.   Further, the Director Defendants so grossly failed to recognize Bancorp's pressing need for outside capital that they waited until April 24, 2008—fully a month after they knew the OTS intended to downgrade the Bank's CAMELS rating to "4" and after learning that the FDIC had concluded the Bank needed up to $3.5 billion in capital to remain viable—to form a special "Capital

- 38 -

COMPLAINT WITH OBJECTIONS AND COUNTERCLAIMS TO DEFENDANTS' CLAIMS

1  Committee" to evaluate and explore opportunities to raise capital and engage

2  formally outside legal counsel to advise them on any such opportunities.

3      142.   Indeed, at or around the same time (April 2008), Bancorp's senior

4  management returned "hat in hand" to many of the very same investors whose

5  proposals those officers originally rebuked, causing one such investor (at Warburg)

6  to remark that, now that the officers "need[] a life line to save [the] business,"

7  they "must be kicking [themselves]" for passing on the investor's earlier proposal.

8          **(b)    MetLife—Perry Rejects a Potential Investor
           Twice, While the Director Defendants Remain
9          Idle**

10     143.   Negotiations with potential investor MetLife demonstrate Perry's

11  near total control over negotiations related to possible investments in the

12  Company, his deliberate failure to keep the Board advised of developments, the

13  recklessness with which he managed negotiations, and the Director Defendants'

14  near complete disengagement from the negotiation process and disregard for their

15  duty to evaluate independently these types of possible investments.

16     144.   On December 4, 2006, MetLife first expressed to Perry an

17  unsolicited desire to invest in Financial Freedom.

18     145.   Perry did not relay MetLife's interest in an investment to the

19  Bancorp and Bank Boards until March 16, 2007, when he noted the fact in an e-

20  mail to the Director Defendants.

21     146.   After some discussion between Perry and MetLife representatives,

22  and as memorialized by an e-mail from Perry to the Director Defendants and

23  Bancorp and Bank senior management dated June 20, 2007, MetLife indicated

24  that during discussions with Perry held earlier that day it would be willing to "get

25  to the $750 million to $1 billion range" in exchange for a "50:50" investment in

26  Financial Freedom.  Perry expressed dissatisfaction with this offer and informed

27

28                              - 39 -

COMPLAINT WITH OBJECTIONS AND COUNTERCLAIMS TO DEFENDANTS' CLAIMS

1 the Director Defendants that he had instructed JP Morgan to shop for other

2 potential investors.

3   147.   After a long gap in communications between MetLife and Bancorp,

4 on or around February 8, 2008, in an e-mail from Perry to MetLife's

5 representative, Perry explained that he had not been returning MetLife's calls

6 regarding Financial Freedom because MetLife's limited contact with Bancorp had

7 left Bancorp with hard feelings and that Perry believed MetLife was trying to

8 "steal" Financial Freedom now that Bancorp was "literally fighting for" its life.

9   148.   Later that day, the MetLife representative replied by noting that

10 MetLife had terminated contact because it thought Bancorp was not especially

11 interested in advancing a transaction, that his calls were not an attempt to "steal"

12 Financial Freedom, and that he would step aside to let another MetLife

13 representative negotiate with Bancorp if Bancorp wanted to pursue a deal with

14 MetLife.

15   149.   By e-mail dated February 11, 2008, Perry wrote to the MetLife

16 representative that Bancorp was "not interested in selling Financial Freedom and

17 in fact, [was] integrating it tighter into Indymac . . . to save costs and sharpen our

18 execution . . . ."  Perry then, in a hollow statement, suggested that Bancorp could

19 survive without raising any outside capital.  Despite such bravado and the short-

20 shrift he gave to MetLife's renewed interest in an investment in Financial

21 Freedom, Perry closed his e-mail by suggesting that a roughly 20% investment in

22 Bancorp "through a convert . . . with the right to buy all of IMB [at some later

23 point] . . . could be a very smart move for someone with courage . . . ."  On

24 information and belief, this was the last communication between Bancorp and

25 MetLife.

26

27

28

- 40 -

COMPLAINT WITH OBJECTIONS AND COUNTERCLAIMS TO DEFENDANTS' CLAIMS

1
2
3
4

       **(c)**    **Warburg—Perry, Not Wanting to Signal "Weakness" to the Market, Unilaterally Kills a Potential Transaction With a Potential Investor, While the Director Defendants Ignore Their Obligation to Assess the Transaction**

5      150.   As with the MetLife transaction, the Warburg deal highlights the

6 detrimental impact to Bancorp caused by Perry's limited communication with the

7 Board and his unilateral and errant decision making in connection with the

8 transaction, as well as by the Director Defendants' failure to apprise themselves of

9 the merits of the transaction.

10      151.   In the initial communication between Warburg and Bancorp, which

11 was memorialized by a March 16, 2007 e-mail from Perry to the Director

12 Defendants, Warburg tendered to Perry an unsolicited offer to purchase Financial

13 Freedom for between $500 million and $700 million.

14      152.   After essentially ignoring Warburg's initial offer for months, on or

15 around June 8, 2007, Perry and Warburg's representative again exchanged e-mails

16 regarding a potential investment in Financial Freedom.  Perry explained that,

17 although he would consider a Warburg sales pitch, he felt it was doubtful that

18 Warburg would be able to "add any value" to Financial Freedom.

19      153.   On information and belief, it was not until August 9, 2007 that Perry,

20 by e-mail, first informed the Director Defendants of Warburg's interest in

21 investing in Financial Freedom.  In Perry's e-mail, he stated that he "made clear

22 to [Warburg] that [Bancorp] do[es not] need to do this."

23      154.   In an August 22, 2007 e-mail from Perry to the Director Defendants,

24 Perry noted that, despite receiving no feedback from Bancorp, Warburg reiterated

25 its interest in making an investment in Financial Freedom and provided Bancorp

26 with a term sheet containing terms consistent with its original proposal.  Perry

27

28

COMPLAINT WITH OBJECTIONS AND COUNTERCLAIMS TO DEFENDANTS' CLAIMS

1    stressed to the Director Defendants the importance that Bancorp avoid the

2    appearance of a "distressed deal."

3        155.    On information and belief, the Director Defendants offered no views

4    on the Warburg deal at this time.

5        156.    On August 23, 2007, Perry then rejected the Warburg terms, stating

6    that Bancorp "do[es not] need the capital" and that he thought "the market would

7    see this proposal, if accepted, as a sign of weakness at IMB."  Rather than

8    pursuing capital that Bancorp actually needed from a serious investor, Perry was

9    more concerned about perceptions and appearances of his stewardship of Bancorp.

10        157.    After further discussions with Warburg, Warburg submitted a revised

11    term sheet.  In summarizing it by e-mail to the Director Defendants on August 27,

12    2008, Perry described the terms as: (1) Warburg would gain one seat on the

13    Bancorp Board; (2) Warburg would pay between $500 million to $750 million in

14    cash; (3) Warburg would receive no warrants as a part of the investment; (4) the

15    coupon on the convertible preferred would fall within the 7.25% to 7.75% range;

16    and, (5) the premium to convert the preferred to common stock would be 0% and

17    5%.  Perry also listed a number of positive effects of consummating a deal with

18    Warburg, and asked for the Bancorp and Bank Boards' permission to relay to

19    Warburg that the proposal "is still a little low, but . . . in the ballpark."  Perry

20    suggested that the Director Defendants meet at some point over the following

21    week to discuss the transaction.

22        158.    In response to Perry's e-mail, later that day numerous Director

23    Defendants sent Perry e-mails expressing an interest in moving forward with the

24    Warburg negotiations as proposed, with only one Director indicating an interest in

25    having a meeting to discuss the matter.

26

27

28

- 42 -

COMPLAINT WITH OBJECTIONS AND COUNTERCLAIMS TO DEFENDANTS' CLAIMS

1       159.   On August 31, 2007, Warburg submitted a due diligence request list

2  to Perry.  Perry responded that Bancorp would begin to provide materials within

3  the week.

4       160.   Thereafter, Perry, unilaterally and without explanation to the Director

5  Defendants, decided that the Warburg terms were unacceptable, and informed

6  Warburg's representative by e-mail on September 4, 2007 that Bancorp no longer

7  wanted to pursue a preferred stock deal with Warburg, suggesting instead that

8  Warburg should simply buy common stock to avoid the appearance of a "bailout

9  and sign of weakness."

10       161.   In reply, Warburg's representative e-mailed Perry on September 5,

11  2007, writing that he was "confused about what changed from last week."  Perry's

12  e-mail response later that day explained, among other things, that Bancorp was

13  "comfortable with . . . current and projected capital levels," did not otherwise

14  "need" to raise more capital, and did not believe the proposed deal would "prove

15  to the market" that Bancorp is a "survivor" because the deal was essentially "on a

16  distressed basis."  Again, Perry put his misplaced concern for appearances ahead

17  of Bancorp's need for outside capital.

18       162.   On or around September 6, 2007, Perry canceled the Bancorp and

19  Bank Board meeting scheduled to discuss a possible Warburg investment because,

20  as he wrote in a September 6, 2007 e-mail to one Defendant, his impression was

21  that "most, if not all directors agreed that [Bancorp] should not pursue the deal

22  [with Warburg] under the terms proposed."  On information and belief, Perry's

23  statement to this Defendant was inaccurate and misleading insofar as he had not

24  communicated with the vast majority of the Director Defendants on this topic.

25       163.   On information and belief, no Director Defendant objected to Perry's

26  cancellation of the meeting, made any inquiry about why the Warburg deal (which

27  just one week ago was acknowledged to be an attractive option) was now—

28

- 43 -

COMPLAINT WITH OBJECTIONS AND COUNTERCLAIMS TO DEFENDANTS' CLAIMS

1  without any Board level discussion—being rejected, or otherwise inquired about

2  the deal itself, including the reasons why Perry rejected it.

3       164.   Roughly six months later, on or about March 24, 2008, now

4  desperately in need of capital, Perry approached Warburg's agent again about a

5  possible investment.  In a March 24, 2008 e-mail that Warburg's agent drafted for

6  internal circulation at Warburg but inadvertently sent to Perry, Warburg's agent

7  wrote that Perry is now "VERY serious about raising capital," and, in fact, Perry

8  "is coming to [Warburg] hat in hand, [because] he needs a life line to save his

9  business."  Warburg's agent recommended passing on an investment in Bancorp

10  because his "sense [wa]s that [Bancorp] may wind up being a casualty."  He then

11  remarked that Perry "sheepishly referred to our conversations [last] summer

12  several times (boy, he must be kicking himself)."

13       165.   Perry quickly informed the Warburg representative of the erroneous

14  transmission, prompting the representative to apologize and to stress that Warburg

15  had been extremely interested in concluding a deal with Bancorp six months

16  earlier.

17       166.   In an e-mail dated March 25, 2008, Perry shared portions of the

18  Warburg e-mail string, including his e-mail identifying the erroneous transmission

19  and Warburg's apology e-mail (but not the underlying misaddressed e-mail) with

20  the Bancorp and Bank Boards.  He then asserted that Bancorp was better off

21  without an investment from Warburg.  On information and belief this is the last

22  communication among the Defendants regarding a Warburg deal.

23              **(d)   Goldman Sachs—Perry and Wohl Quickly Cut
24              Off Talks With an Investor, While the Director
                Defendants Again Ignore Their
25              Responsibilities Regarding Such Deals**

26       167.   Perry and Wohl's discussions with Goldman Sachs ("Goldman")

27  about a possible investment in Financial Freedom again highlight how quick

28                                   - 44 -

COMPLAINT WITH OBJECTIONS AND COUNTERCLAIMS TO DEFENDANTS' CLAIMS

1 senior management, which maintained inordinately strict control over negotiations

2 with investors, could be to dismiss outside capital sources.  These discussions also

3 reveal the Director Defendants' failure to inform themselves about potential

4 transactions at a time when, given the Bank's capital needs, they were especially

5 obligated to pursue and evaluate such deals.

6       168.   In the initial communication between Goldman and Bancorp,

7 memorialized in an August 24, 2007 e-mail string between Perry and Goldman's

8 representatives, Goldman expressed an unsolicited interest in Bancorp (offering

9 no terms) and Perry stressed that Bancorp was "not a company in distress."

10       169.   After some negotiations, in an e-mail dated September 20, 2007 from

11 Perry to the Director Defendants, Perry relayed Goldman's interest in investing

12 $200 million in convertible preferred stock at a 7% to 8% coupon (Goldman

13 would acquire a 40% equity stake upon conversion) in Financial Freedom,

14 independent of any investment Warburg might make.  Perry added that

15 Goldman's "pitch is they can really help strategically with [Financial

16 Freedom] . . . .  I do think they can help strategically (and maybe more than the

17 insurance guys like Mass Mutual…who we are talking to tomorrow) . . . but this

18 is a pretty cheap price and not one I am inclined to recommend to the board."

19       170.   The next day, Perry e-mailed the Director Defendants to relay that he

20 viewed a possible Goldman deal as "likely a non-starter."

21       171.   On October 2, 2007, Wohl and Perry exchanged e-mails and together,

22 without any further discussion with the Director Defendants, decided to terminate

23 discussions with Goldman.

24          **(e)    Mass Mutual—The Defendants Admit the
25                   Investor is Attractive, Yet Do Nothing to
                     Pursue a Deal**

26       172.   The Mass Mutual transaction is another example of a situation that

27 was all too common among the Defendants 'efforts' to raise capital for Bancorp—

28                                    - 45 -

COMPLAINT WITH OBJECTIONS AND COUNTERCLAIMS TO DEFENDANTS' CLAIMS

1  an investor that Perry and possibly the Director Defendants view as attractive

2  submits an unsolicited and initially appealing proposal, yet the Defendants take no

3  meaningful steps to advance the deal.

4       173.   In an e-mail from Perry to the Director Defendants dated September

5  28, 2007, Perry informed Bancorp and Bank Boards that, earlier in the week,

6  Mass Mutual expressed an interest in purchasing up to a 20% stake in Financial

7  Freedom with a possible right of first refusal in connection with Financial

8  Freedom.  Perry explained to the Board in this and subsequent e-mails that he

9  viewed the possible transaction as favorable given Mass Mutual's "great credit

10  rating, big balance sheet, and solid brand."

11       174.   Notwithstanding the promising initial reaction, Bancorp made

12  minimal efforts to advance the deal over the next few months.  In late December

13  2007, senior managers at the Bank learned that Mass Mutual was preoccupied

14  with another investment.  Consistent with its position that it would "not reach[]

15  out to them [Mass Mutual]," the Defendants had no further communications with

16  Mass Mutual regarding a possible transaction.

17              **(f)    Ares—The Director Defendants Ignore Their**
                         **Duties Yet Again, While the Investor Calls**
18                       **Perry's Bluff and Abandons the Deal**

19       175.   The Ares transaction is still another example of a deal in which the

20  Director Defendants deferred to Perry and ignored their duties to become

21  informed about a capital raising transaction.  Perry's decision to strong-arm and

22  bluff Ares—the only investor with serious interest at the time—reveals Perry's

23  reckless approach to raising capital the Bancorp desperately needed.

24       176.   In an e-mail from Perry to the Bancorp and Bank Boards dated

25  October 19, 2007, Perry relayed to the Boards a tentative investment proposal

26  from Ares under which Ares would purchase $500 million in convertible

27  preferred stock with a 6% coupon.  Perry's reaction to the initial terms was that

28                                    - 46 -

1  they sounded "to[o] good to be true," but that he nonetheless recommended

2  negotiating with Ares.

3      177.   On October 23, 2007 Ares submitted a term sheet to Bancorp with

4  the following terms: (i) Ares would gain two board seats; (ii) Ares would make an

5  investment of $250 million; and (iii) Ares would receive a coupon of 10%.

6      178.   After further negotiations, by December 7, 2007, Ares became

7  interested solely in purchasing Bancorp common stock.

8      179.   On December 14, 2007, Perry e-mailed the Director Defendants to

9  inform them that, to blunt further negotiations as to price, he had told Ares that

10  they had until "next week" to present final deal terms and that any modifications

11  after that deadline would result in Bancorp's out-of-hand rejection of the deal so

12  that Bancorp could focus on other interested investors.  Given that Bancorp

13  already had decided not to "reach out" to Mass Mutual—the only other viable

14  investor at this time—this was clearly a bluff.

15      180.   On December 12, 2007, by e-mail, JP Morgan, on behalf of Bancorp,

16  informed Ares that, due to its failure to make a firm offer, Bancorp planned to

17  invite other investors to conduct due diligence.

18      181.   Despite the Defendants' negotiating tactics, Ares remained open to

19  investing in Bancorp.  However, the Defendants did virtually nothing to pursue

20  discussions with Ares.  Indeed, on January 8, 2008, Keys explained to certain

21  senior managers:  "I think Ares is dead."  Seven weeks later, on February 24,

22  2008, when senior bankers at JP Morgan suggested Perry meet with an investor

23  group that included Ares, Perry quickly dismissed the idea, noting: "[T]here are

24  definitely hard feelings about Ares...and trust issues; I don't think we would have

25  interest in talking to them again."

26      182.   Six months later and with Bancorp on its last breath, on June 28,

27  2008, Perry e-mailed the Director Defendants to indicate that he had contacted

28                                    - 47 -

COMPLAINT WITH OBJECTIONS AND COUNTERCLAIMS TO DEFENDANTS' CLAIMS

Ares about renewing talks about an investment in Bancorp, but Ares was no longer interested.

**(g)    Other Attempts to Raise Capital Also Fall Short Due to the Defendants' Dilatory and Ineffectual Approach**

183.    In addition to the possible deals described in Paragraphs 143-182, Bancorp, through the Defendants, also failed to pursue numerous other possible capital raising opportunities from December 2006 through May 2008.  Only after its capital needs were acute and totaling billions of dollars, did the Defendants even begin to take measures to preserve the solvency of Bancorp and the adequacy of capital at the Bank.

184.    The collective weight of the Defendants' failure to recognize Bancorp's dire need for outside capital, combined with the Director Defendants' failure to oversee Defendant Perry and senior management's ineffectual and myopic capital raising efforts, directly caused Bancorp's insolvency and the Bank's capital inadequacy.  Accordingly, the Defendants abdicated and deliberately disregarded their corporate responsibilities, breaching their fiduciary duties to Bancorp.

185.    As a result of these failures of the Defendants, Bancorp incurred damages equal to, at a minimum, the total amount of the downstreamed funds during the time period during which such failures occurred plus the value of any other assets—both tangible and intangible—that Bancorp lost as a result of the OTS's seizure of the Bank and Bancorp's subsequent bankruptcy petition.

**4.    Disregard for Financial Red Flags**

**(a)    Negative Analyst Reports Proliferate From 2005 Forward**

186.    Bancorp was publicly traded and, therefore, was the subject of written reports by numerous security analysts from 2004 through 2008.  Senior

- 48 -

1  management at Bancorp, including Perry as well as the Director Defendants,

2  reviewed many, if not all, such reports and/or summaries thereof.

3       187.   These reports, additional details about which are set forth in

4  Appendix 1 to the Complaint, collectively paint a picture, as far back as 2005, of

5  Bancorp as one poised for and/or in sharp decline due to its unsustainable and

6  high-risk business model and the declining market conditions.

7       188.   For example, in late 2005, Roth Capital Partners lowered its rating of

8  Bancorp to "Neutral" because, "[i]n our estimation, it is easy to conceive of a

9  scenario where events get just as bad just as quickly for residential lenders as the

10  planets aligned in their favor earlier in this decade."

11       189.   In 2006, analysts further downgraded Bancorp's ratings.  For

12  example, in May 2006, Bank of America lowered its rating on Bancorp to "Sell"

13  due to concerns over Bancorp's loan valuation and because it thought the

14  market's cyclical downturn would put pressure on Bancorp.

15       190.   The onslaught of negative analyst reports continued into early 2007,

16  yet the Defendants failed to recognize the red flags the market was waving before

17  them or react in any meaningful way to the valid issues raised by the reports.  For

18  example, on January 17, 2007, Keefe, Bruyette & Woods ("KBW") downgraded

19  Bancorp to "Underperform" from "Market Perform," based on its belief that

20  Bancorp's recent credit charges "cast doubt on the true level of profitability on

21  some portion of recent production."

22       191.   Months later, in March 2007, KBW continued its drum beat,

23  reducing its earnings per share ("EPS") estimate for Bancorp due to "weaker loan

24  production," "higher credit costs," and "pressure on GOS [Gain on Sale]

25  margins," and cautioning that "the aggressiveness of IndyMac's underwriting in

26  2006 is still underappreciated."  Rather than address the red flags highlighted,

27  Perry engaged in post-hoc rationalization with the Director Defendants,

28

- 49 -

COMPLAINT WITH OBJECTIONS AND COUNTERCLAIMS TO DEFENDANTS' CLAIMS

1  explaining that the Bank's expansion into "Alt-A" markets was necessary to

2  increase profits because "the margins in plain vanilla conforming and jumbo

3  [mortgages] were very thin."

4     192.   By late summer, analysts recognized the possibility of a Bancorp

5  breakup and began to view Bancorp as unlikely to survive.  Specifically, on or

6  about August 23, 2007, Bank of America reiterated its "Sell" rating for Bancorp,

7  and noted that "in light of current market conditions, we believe there is a

8  probability of a liquidity induced sale / breakup of the company."

9     193.   By the fourth quarter of 2007, analysts, including Standard & Poor's,

10  continued to downgrade Bancorp and highlighted Bancorp's need to raise funds to

11  remain well-capitalized.  As discussed above, the Defendants not only failed to

12  raise capital, but also failed to make meaningful changes to Bancorp's business

13  model.  Indeed, with 2008 approaching, the analyst reports were full of red flags

14  that Defendants failed to recognize.

15     194.   A little more than a week before Defendants improperly authorized a

16  significant capital infusion from Bancorp to the Bank, Friedman, Billings,

17  Ramsey & Co. reiterated its "Underperform" rating on Bancorp.  It wrote,

18  "[b]ottom line, investors have no faith in current or future value" of Bancorp's

19  stock.

20     195.   On or about May 13, 2008, RBC Capital Markets reiterated its

21  "Underperform" rating for Bancorp, and termed it a "Speculative Risk." RBC

22  explained: "Continued erosion suggests that IMB is at risk from regulatory

23  intervention if it is unable to improve capital ratios or re-capitalize its balance

24  sheet, the implications of which could be severe for the bank, in our view. We

25  would not rule out even very draconian actions by regulators at this juncture if

26  capital erosion and credit weakness continue."

27

28

- 50 -

COMPLAINT WITH OBJECTIONS AND COUNTERCLAIMS TO DEFENDANTS' CLAIMS

1   196.   Notwithstanding the slew of negative analyst reports over a period of

2   years, the Defendants failed to heed or address the red flags presented in those

3   reports.  By failing to do so, Defendants acted with a callous disregard for

4   Bancorp's best interests and breached their fiduciary duties to Bancorp by, among

5   other things, improperly authorizing the Downstream Transactions.

**(b)   The Defendants Were or Should Have Been
Aware of the Poor Performance of Other
Mortgage Lenders with Similar Business
Models**

9   197.   In addition to ignoring analysts' scrutiny, the Defendants failed to

10  perceive the market reality, as evidenced by the struggles and ultimate demise of

11  peer firms with substantially similar business models.  These firms, including

12  lenders that specialized in nonconforming mortgage loans, were facing dire

13  circumstances by the beginning of 2007.  Rather than heed the warning signs, the

14  Defendants took the misguided view that Bancorp somehow was different from

15  those lenders and would successfully "weather the storm."

16  198.   For example, after receiving a Cease and Desist Order from the FDIC

17  on February 27, 2007, Fremont General Corporation, the parent of Fremont

18  Investment and Loan, a major subprime lender, announced plans to exit the

19  subprime mortgage business.  Fremont sold its $7 billion portfolio of residential

20  mortgages, at a loss of several hundred million dollars, in April 2007.

21  199.   Defendant Perry's reaction to Fremont exiting the market, which he

22  shared with the other Director Defendants as well as Bancorp's senior managers,

23  was predictably optimistic and untethered to business reality.  He remarked: "I

24  can guarantee you that Citi, Wells, Countrywide, HSBC, and IndyMac, etc….will

25  not be exiting the subprime market unless forced to do so…which should be

26  healthier and more profitable…once all the competition like [Fremont], New

27  Century, etc….are weeded out."

28

COMPLAINT WITH OBJECTIONS AND COUNTERCLAIMS TO DEFENDANTS' CLAIMS

1    200.   Quickly proving Perry wrong, Wells Fargo & Co. ("Wells Fargo"),

2  the nation's second-largest home lender, announced on July 26, 2007 that it would

3  stop making subprime loans through brokers.  Seven days later, on August 3,

4  2007, Wells Fargo also announced that it would curtail its exposure to Alt-A loans.

5    201.   Thereafter, a series of major financial institution failures and

6  retrenchments in 2007, which arose from subprime lending practices and which

7  are listed in Appendix 2 to the Complaint, did nothing to change Perry's approach

8  and he continued to lead Bancorp and the Bank toward failure.  Rather than see

9  the troubles befalling peer entities with business models similar to Bancorp as a

10  harbinger of Bancorp's market evaporating, Defendants inexplicably viewed the

11  failures of such peer firms as evidence of Bancorp's strength and an opportunity

12  to gain market share.  Thus, the Defendants continued to ignore the obvious flaws

13  in Bancorp's business model and to perpetuate the same risky business practices

14  Bancorp had been pursuing for years.  Defendants' misperception of their

15  business model and the marketplace harmed Bancorp irrevocably.

16       **(c)    Defendants Knew of, but Disregarded,**
         **Numerous Breaches of Bancorp Liquidity**
17       **Policy and Capital Policies**

18    202.   Bancorp's Liquidity Policy, which was designed to maintain fiscal

19  stability at the holding company, required Bancorp to maintain liquid assets equal

20  to 12 months of projected cash outflows for stock dividends and interest payments

21  on unsecured debt.  Bancorp policy required Bancorp's Board of Directors, and

22  thus the Director Defendants, to be notified if a breach of the Liquidity Policy

23  occurred.

24    203.   Bancorp's Liquidity Policy was breached on multiple occasions from

25  2005 to 2008.  Consistent with Bancorp's Capital Monitoring Policy, among other

26  policies, the Director Defendants and Perry were informed of these breaches.  Yet,

27  on information and belief, they did little, if anything, to investigate the reasons for

28                                 - 52 -

COMPLAINT WITH OBJECTIONS AND COUNTERCLAIMS TO DEFENDANTS' CLAIMS

1   the breaches or to ensure that breaches would not recur.  Examples of Bancorp

2   Liquidity Policy breaches include, but on information and belief, may not be

3   limited to:

        (a)     A fourth quarter 2005 breach due to $165 million
4               in downstreaming transactions in December 2005
5               that was memorialized by memorandum from
            Fransisco Nebot ("Nebot"), Bancorp Treasurer, to
6               the Director Defendants dated January 11, 2006.

7           (b)     Breaches as of January 31, 2006 due to "minimal
            loan sales in January relative to funding volume,"
8               which were memorialized in a March 20, 2006
            memorandum from David Hayes ("Hayes"),
9               Senior Vice President of Corporate Finance, to
            Perry, Keys, Ruthann Melbourne ("Melbourne"),
10              EVP and Chief Risk Officer, and the Capital
            Funding and Liquidity Committee ("CFLC
11              Committee") members.

12          (c)     Breaches as of February 28, 2006 for "minimal
            year to date loan sales activity relative to funding
13              volume," which were memorialized in a March 31,
            2006 memorandum from Hayes to Perry, Keys,
14              Melbourne and the CFLC Committee members.

15      204.    In September 2006, Bancorp's Liquidity Policy was strengthened by

16  the Board to require Bancorp to maintain liquid assets equal to "the greater of: (a)

17  [f]our quarters current period common dividends, plus four quarters current period

18  outflows for interest expense on existing Trust Preferred debt, Reserve for margin

19  calls equal to 5% of current period Repo liability balance, less up to $75 mm

20  availability on a LOC; or (b) $60 mm in Cash."  The amendments further required

21  Bancorp's "CEO [] to review Bancorp's liquidity position and compliance with"

22  these guidelines "at least quarterly, or more frequently as deemed necessary."

23  Despite these amendments, Bancorp continued to breach the Liquidity Policy with

24  regularity.

25      205.    On October 3, 2006, Hayes advised Perry and other senior managers

26  of Bancorp of further Policy violations that had "resulted primarily due to record

27  loan production in August relative to sales activity, which caused a net increase in

28                                   - 53 -

1  HFS [held for sale] assets of $2.9 bn."  Put simply, the Bank had originated more

2  loans than it could sell on the secondary market.

3      206.   Perry responded to Hayes as follows:

4      I see this as a problem.  You can't just violate management policies….if
       you can, then they are not really policies.  Either we have a limit monthly
5      on risk-based or we do not…if we have it, I expect we need to do
       everything in our power to meet it….which we clearly did not here!!!!
6
       Also, I do not like the idea that we are being told of a violation that
7      occurred at the end of August on October 3rd.  I know this has been rectified,
       but this is way too slow.  I am talking 24 hours should be the standard or
8      better yet, in advance thru forecasting . . .the 'status quo' is not acceptable.

9      207.   Perry's e-mail was, it seems, mere bluster, as Liquidity Policy

10 violations and lax oversight by the Director Defendants continued apace, despite

11 his admonitions.

12     208.   In addition, on or about March 8, 2007, the OTS presented Nebot

13 with a memorandum titled "Examiner Recommendations" listing five separate

14 violations of the Liquidity Policy that occurred in 2006.

15     209.   Again, on or about October 30, 2007, Keys advised a meeting of the

16 Director Defendants of the circumstances surrounding Bancorp's "temporary dip

17 below its liquidity policy by 33.8 million."  In explaining the "temporary dip,"

18 Keys pointed to the downstreaming of $175 million from Bancorp to the Bank.

19     210.   Bancorp again revised the Liquidity Policy on December 10, 2007.

20 The Policy now required Bancorp to "maintain liquid assets equal to the greater of:

21 six [] times subsequent quarter's projected common dividend, plus six [] times

22 subsequent quarter's projected interest expense on existing Trust Preferred Debt,

23 plus Reserve for margin calls on equal to 5% of current period Repo liability

24 balance; or $45 million in cash."

25     211.   As with prior amendments, this change had little impact on a

26 Bancorp culture where unchecked Liquidity Policy violations had become the

27

28                               - 54 -

1    norm.  Indeed, Bancorp capital policies continued to be violated throughout 2008.

2    2008 breaches include, but are not limited to, the following:

3          (a)     A wide range of policy breaches (including
4                inadequate capital, debt, and leverage ratios) that
were "directly attributable to our Q4-07 Bancorp
5                Consolidated net loss of $509 million, which is
primarily the result of increased credit costs" on
6                or around February 5, 2008, all of which were
memorialized in a memorandum of the same day
7                from Hayes to Perry, Nebot, Pamela Marsh, EVP
of Finance, and the CFLC Committee members.

8          (b)     A breach (totaling $26.7 million) in the first
9                quarter of 2008 due to a $70 million downstream
transfer from Bancorp to the Bank made during
that time, which was memorialized in a
10                memorandum from Nebot to the ERM Committee
Defendants dated May 5, 2008.  According to this
11                memorandum, Bancorp would remain out of
compliance with the Liquidity Policy for the
12                remainder of 2008.

13       212.   ERM Committee Defendants, and ultimately, the Director

14    Defendants, failed to react to the aforementioned breaches of Bancorp's Liquidity

15    Policy.  As a direct result, and as seen by the foregoing extensive list of Liquidity

16    Policy breaches, Bancorp repeatedly was in violation of the very Policies meant to

17    help safeguard its assets and ensure its solvency.

18       213.   The Director Defendants, moreover, by treating policy breaches as

19    inconsequential given their indifference and lack of response, left themselves ill-

20    positioned to detect the worsening financial condition at Bancorp leading up to

21    Bancorp's insolvency.

22          **(d)**     **The Defendants Knew of, but Disregarded,**
23                **Signs of Worsening Performance at Bancorp
and Continued to Adhere to the Same Business
Plan Despite Increasingly Negative Results**

24

25              **(i)**     **The Defendants Were Apprised of, but
Chose to Ignore, Early Warning Signs**

26       214.   As early as 2005, Perry and the Director Defendants discussed

27    concerns about the direction of the housing and mortgage markets.  On October

28                                    - 55 -

1    26, 2005, for example, Perry stated at a meeting with the Audit Committee that

2    "the mortgage market is in a state of flux" and that there was "widespread concern

3    that conditions for our industry will get worse before they get better."

4        215.   Although such concerns were shared with all of the Director

5    Defendants, no action was taken to change Bancorp's business strategy.  On or

6    about December 5, 2005, Minutes of a Regular Meeting of the Bank's Strategic

7    and Financial Planning Committee, attended by Defendants Gramley, Grant,

8    Haden, Hodel, Hunt, and Willison, noted that Bancorp, given the projected

9    housing market, had engaged in an analysis of whether Bancorp should diversify

10   or stay the course, and it was determined that "it was best to stay the course."

11       216.   Early on, red flags appeared.  Early payment defaults ("EPDs") and

12   repurchases, on information and belief, began increasing in late 2005 and early

13   2006.  At an October 30, 2006 meeting with the Audit Committee, Keys stated

14   that "problem assets are trending up," with repurchases and EPDs notably

15   increasing.  Keys also noted that only 84% of the loan production from the Bank's

16   Conduit Division was sold in the third quarter of 2006 versus the near 100% of

17   production sold in the previous quarter.  Despite this fact, production in the

18   Conduit Division continued to increase each quarter of 2006, topping off at

19   $9.416 million of new production as of December 31, 2006.

20       217.   The Defendants were regularly apprised of the negative news

21   regarding EPDs and repurchase requests.  In fact, Bancorp Board meeting minutes

22   from December 5, 2006, indicated that Director Defendant Hunt noted that the

23   Bank's income loans—especially those originated through Bancorp's Conduit

24   Division—were resulting in EPDs more often than full document loans.  However,

25   the minutes concluded that Bancorp's "losses to date have been nominal," and the

26   minutes contained no further discussion on how best to resolve the EPD issues.

27

28                          - 56 -

COMPLAINT WITH OBJECTIONS AND COUNTERCLAIMS TO DEFENDANTS' CLAIMS

**(ii)**    **The Defendants Continue to Ignore Red Flags Despite the Increasing Frequency and Severity of Negative Financial Indicators**

218.    The red flags continued throughout 2006 and 2007. During this period, Perry frequently expressed concerns about the market—in particular with respect to Bancorp's ability to sell loans into the secondary mortgage market. The Treasury Report cited an e-mail from Perry to Bancorp executives, written in the beginning of 2007, regarding concerns about the thrift's subprime portfolio. The Treasury Report stated:

> [Perry's] message stated that IndyMac needed to get ahead of the secondary market and trade as much as they could as fast as they could in small deal sizes. . . [T]he CEO detailed liquidity problems in the subprime market and the thrift's efforts to pare back risk. Specifically, the CEO stated that the thrift's financial condition was suffering from the effects of its subprime loans and was in the process of structuring a transaction to sell approximately $1.1 billion of them. He went on to say that Wall Street had 'pulled financing from investors.' He said that the thrift also needed to revisit product guidelines in the high risk areas such as subprime, fully financed mortgages as well as the thrift's higher loan-to-value (LTV) products and make those products 'considerably more conservative.'

219.    Despite Perry's warnings and vague calls for change, the Bank did not aggressively implement any policies to fix its weak underwriting standards or otherwise attempt to originate more saleable loans. In fact, nearly an entire year passed before Bancorp finally implemented tightened underwriting guidelines.

220.    Another major red flag, well known to Defendants, was Bancorp's quickly declining stock price and EPS. On or about January 11, 2007, in an e-mail from Perry to the Bancorp and Bank Boards regarding the fourth quarter of 2006, Perry wrote that EPS "plummeted" to $0.97 from the forecasted $1.35—a forecasting error so significant that management originally thought the actual figures were erroneous.

221.    In Bancorp's 10-Q for the first quarter of 2007, Bancorp reported net earnings of $52.4 million—a decrease of 34% compared with the net earnings of

COMPLAINT WITH OBJECTIONS AND COUNTERCLAIMS TO DEFENDANTS' CLAIMS

$79.8 million for the first quarter of 2006.  Bancorp also reported that it repurchased $224 million of loans "mainly due to early payment defaults" in the first quarter of 2007.

222.   In the Spring and Summer of 2007, conditions continued to deteriorate in the mortgage market.  On or about June 19, 2007, Abernathy, in an e-mail to Nebot regarding asset-backed securities losses, wrote: "The losses passed thru in [M]ay are shockingly high."

223.   Bancorp's second quarter 2007 Form 10-Q reported net earnings of $44.6 million, or $0.60 per diluted share—a decrease of 57% and 60% in net earnings and EPS, respectively, compared with the net earnings of $104.7 million, or $1.49 per diluted share, for the second quarter of 2006.  Bancorp noted that "[t]he decline in profitability is mainly attributable to higher credit costs and a lower MBR margin."  The 10-Q also noted that Bancorp repurchased $443 million worth of loans in the first half of 2007, "mainly due to early payment defaults," compared to $62 million in the first half of 2006.  In the second quarter of 2007 Bancorp repurchased $219 million worth of loans compared with $48 million for the second quarter of 2006.

224.   Bancorp reported in its July 2, 2007 Form 8-K that non-performing assets were up "342 percent."

225.   Incredibly, despite the relentlessly negative data quarter after quarter, in discussing preliminary results for the second quarter of 2007, on or about July 10, 2007,  Perry indicated that he was "pleased with [Bancorp's] business model and performance."

226.   On August 14, 2007, Bancorp projected losses of $30 million for the third quarter, the first quarterly loss in its history.

227.   Despite the ever-worsening economic news, Perry and senior management inexplicably decided in late August 2007 to re-institute some of the

COMPLAINT WITH OBJECTIONS AND COUNTERCLAIMS TO DEFENDANTS' CLAIMS

1 | risky loan products that had previously been cut.  According to an e-mail from

2 | Perry to Bank personnel written on or about August 31, 2007:

> While we have recently begun to re-institute some of the products we cut . . .
> like jumbo home loans and improve some of our pricing, our loan volumes
> remain down substantially . . . our production model has clearly been
> 'wounded' in the short run by this marketplace and we are having to make a
> rapid transition to become more of a GSE and FHA/VA lender . . . But our
> 'wounds' pale in comparison to the industry wounds . . . every major
> subprime lender is dead or on life support . . . . Frankly, while our stock is
> way down, IMB has come through this crisis period, better than any other
> independent home lender that I am aware.

228.   On or about September 5, 2007, in an e-mail to certain Bancorp managers regarding Moody's analysis of the Bank's Home Equity Line of Credit ("HELOC") deals, Abernathy stated that Moody's loss "estimates are alarming" and "[a]lthough Moody[']s is likely over estimating our losses, it appears that we are drastically under-estimating our losses."

**(iii)   Perry Admits the Losses Resulted From Poor Business Practices that Focused on Loan Volume Rather Than Quality – Including Defendants' Fundamental Failure to Ensure Basic Loan Underwriting Practices Were In Place and Followed**

229.   Although the Defendants took no meaningful action to address the red flags that had proliferated up to this point, by late 2007, they openly admitted that, among other things, their deliberate and, at times, blind pursuit of profits and self-interest over safe and sound business practices had created the circumstances that ultimately would cause the Bank's failure and Bancorp's insolvency.

230.   For example, on or about October 15, 2007, in an e-mail from Perry to the Director Defendants and management regarding Countrywide's September 2007 Production Statistics, Perry wrote: ***"The world has changed . . . we need to be concerned about credit quality and profitability . . . not loan volume and market share."*** (Emphasis added.)

COMPLAINT WITH OBJECTIONS AND COUNTERCLAIMS TO DEFENDANTS' CLAIMS

231.    A week later, on or about October 22, 2007, Perry noted that *"roughly 2/3rds of our credit losses were poor management judgment not the market."* (Emphasis added.)

232.    On or about October 31, 2007, Perry reviewed a draft of Bancorp's third quarter 2007 Investor Presentation for the Director Defendants at a joint telephonic meeting of Bancorp and Bank Boards.  The presentation, distributed as part of the "Board Package" for the meeting, explained what the Bank "got wrong," including that: the Bank over-expanded its product guidelines during the housing boom (especially second liens, piggybacks, HELOCs, and subprime mortgages); the Bank's underwriting procedures failed to detect speculators making high combined loan-to-value purchases; the Bank failed to implement certain essential credit hedges; and, the Bank significantly underestimated the length and severity of the housing downturn.

233.    Perry updated senior managers on the October 31, 2007 Joint Board meeting the following day.  In describing the meeting, he stated:

> Bottom line, the board understands the issues facing our industry, the unprecedented decline in housing sales and prices, the results of our peers (which have ranged from bankruptcies, to major liquidity scares, to massive losses, and to manageable losses similar to ours) and our performance, and they remain strongly supportive of management.

> While clearly, with the benefit of hindsight, we made some serious mistakes with respect to credit risk management…they are confident that we are taking the appropriate steps to mitigate our losses and prevent this from happening (at least in this magnitude) to IMB again.

> I have not discussed anyone's individual performance with the board.[]  I have told them, '*It is my responsibility; my fault.*'  With that said, I do feel strongly that we deserve to be in the position we are in personally…with our stock options and restricted stock (which had about $160 million in gains in them at 12/31/06) nearly all currently 'underwater' and those gains temporarily wiped out, plus reduced compensation prospects for a time.

> In addition, from here forward…I am putting the entire management team on notice.  You all know that credit quality and profitable business is job one…every one of you needs to make a difference, execute well, be profitable now and don't make any major mistakes.  If you can't do this [] I will, unfortunately, be forced to 'kick you off the island.'  (Emphasis added.)

- 60 -

234.    In reacting to analyst downgrades after Bancorp reported missing its earnings forecasts on a November 6, 2007 earnings call, Perry wrote that, although he felt that many industry players made mistakes worse than Bancorp, it was undeniable that "we made too many mistakes and *we [senior managers] all had a hand in where we are today*."  (Emphasis added.)

235.    As loss projections increased and the OTS began a comprehensive examination of the Bank, Perry continued to take responsibility for Bancorp's losses.  On January 8, 2008, in an e-mail to Bancorp management, copying the Director Defendants, regarding the Bank's poor management of credit risk, Perry stated *"[T]he losses are 100% operating management's fault (from me on down)."* (Emphasis added.)

236.    On or about January 31, 2007, Perry sent an e-mail to Bank managers noting that, although employees claimed the Conduit Division was responsible for a substantial portion of Bancorp's problems, it was the loan servicing/investor accounting department that was "'facilitating' or enabling the poor business practices upstream to continue . . . ."  James Banks, EVP of the Conduit Division, responded to Perry that he was "determined to create as much volume/profit as [the unit] could prudently/physically handle, knowing full well that [the unit] didn't have the optimal infrastructure in place."  Perry responded by admitting that *"support for volumes and profits at the expense of less than fully professional business practices is over."* (Emphasis added.)

237.    On February 12, 2008, Bancorp issued its 2007 Annual Letter to Shareholders.  The letter noted, among other statistics, that Bancorp's non-performing assets had increased eight-fold to $1.51 billion (4.61% of assets) as of December 31, 2007, up from $184 million (0.63% of assets) at December 31, 2006.  In a mea cupla, Perry wrote that he *"take[s] full responsibility for the errors we made at IndyMac . . . ."* (Emphasis added.)

- 61 -

COMPLAINT WITH OBJECTIONS AND COUNTERCLAIMS TO DEFENDANTS' CLAIMS

238.   In this instance, Perry was right.  He and the other Defendants are fully responsible for both the demise of the Bank and the enormous damages that Bancorp suffered.  They disregarded clear red flags about Bancorp's worsening financial position as they repeatedly violated Bancorp policies to "downstream" hundreds of millions of dollars to the Bank with no reasonable hope that the transferred funds could accomplish anything other than prolonging momentarily the date of destruction for both entities.  As a result of the Defendants' deliberate and reckless disregard for such glaring red flags, Bancorp incurred damages equal to, at a minimum, the total amount of the downstreamed funds during the relevant time period plus the value of any other assets—both tangible and intangible—that Bancorp lost as a result of the OTS's seizure of the Bank and Bancorp's subsequent bankruptcy petition.

## V.   CLAIMS FOR RELIEF

### A.   Disallowance and Subordination Claims
### Count I

**(Disallowance Under Bankruptcy Code Section 502(b) Against All Defendants)**

239.   Plaintiff incorporates by reference and re-alleges the allegations in Paragraphs 1-238 as though fully set forth herein.

240.   On November 24, 2008, Perry filed a Proof of Claim in this Court against the Chapter 7 bankruptcy estate of Bancorp for unpaid prepetition compensation, termination damages, and indemnification.

241.   On November 26, 2008, Gramley, Haden, and Willison each filed a Proof of Claim in this Court against the Chapter 7 bankruptcy estate of the Debtor for deferred compensation.

COMPLAINT WITH OBJECTIONS AND COUNTERCLAIMS TO DEFENDANTS' CLAIMS

1   242.   On November 26, 2008, Caldera, Grant, Hodel, Hunt, and Kennard

2   each filed a Proof of Claim in this Court against the Chapter 7 bankruptcy estate

3   of the Debtor for indemnification rights.

4   243.   By reason of the foregoing facts, and pursuant to 11 U.S.C. § 502(b),

5   the claims of the Defendants must be disallowed.

6   244.   Bankruptcy Code section 502(b) provides, in relevant part:

7   Except as provided in subsections (e)(2), (f), (g), (h) and (i) of this section,
    if such objection is made, the court, after notice and a hearing, shall
8   determine the amount of such claim in lawful currency of the United States
    as of the date of the filing of the petition, and shall allow such claim in such
9   amount, except to the extent that—(1) such claim is unenforceable against
    the debtor and property of the debtor, under any agreement or applicable
10  law for a reason other than because such claim is contingent or unmatured.

11  245.   The Proofs of Claim of Perry, Gramley, Haden, Willison, Caldera,

12  Grant, Hodel, Hunt, and Kennard are invalid or unenforceable against Bancorp for

13  a reason other than because such claims are contingent or unmatured.  Without

14  shifting the burden of proof, production or persuasion, the Trustee, on information

15  and belief, contends that the claims asserted in the aforementioned Proofs of

16  Claim are invalid or unenforceable, inter alia, for the reasons set forth in

17  Paragraphs 265-302 below.  The Trustee expressly reserves the right to amend

18  based on discovery and to conform to proof.

19  246.   On information and belief, the Trustee generally denies the legal and

20  factual allegations made in Paragraphs 3, 5, 6, 7, 8, 9, 10, 11, 12, and 13 of

21  Perry's Proof of Claim, and the "Statement of Claim" sections in Gramley, Haden,

22  Willison, Caldera, Grant, Hodel, Hunt, and Kennard's Proofs of Claims

23  247.   The Trustee further alleges that the allegations made in Paragraphs 5,

24  6, 7, 8, and 9 of Perry's Proof of Claim fail to state a claim on which relief can be

25  granted or a valid basis in law for a claim against the Estate.  In particular, and

26  without limiting the generality of the foregoing, (i) Paragraphs 5 and 6, 7, 8, and 9

27

28

COMPLAINT WITH OBJECTIONS AND COUNTERCLAIMS TO DEFENDANTS' CLAIMS

1  fail to allege facts giving rise to enforceable payment obligations of Bancorp or its

2  estate.

3      248.   The Trustee further alleges that the allegations made in the

4  "Statement of Claim" sections in Gramley, Haden, Willison, Caldera, Grant,

5  Hodel, Hunt, and Kennard's Proofs of Claim fail to state a claim on which relief

6  can be granted or a valid basis in law for a claim against the Estate.  In particular,

7  and without limiting the generality of the foregoing, the Statement of Claim

8  sections fail to allege facts giving rise to enforceable payment obligations of

9  Bancorp or its estate.

10     249.   The Trustee further alleges that, to the extent any of the Defendants'

11 Proofs of Claim seek indemnification under Bancorp's articles of incorporation or

12 by-laws, or under any agreements or governing laws, the indemnification does not

13 extend any of the Defendants herein due to each of the Defendants' lack of good

14 faith and many breaches of their duties of loyalty.

15     250.   The Trustee further alleges that it may offset or recoup any amounts

16 allowed under this Complaint against allowed amounts under the Defendants'

17 Proofs of Claim filed in connection with the Bankruptcy Case.

18     251.   Therefore, the Proofs of Claim should be disallowed or, if allowed at

19 all, only allowed in an amount that reflects (a) enforceable obligations against

20 Bancorp under applicable law and (b) an appropriate credit for the offsets and

21 recoupment set forth hereinabove (including but not limited to this Complaint).

22              **<u>Count II</u>**

23 **(Subordination of Claims Under Bankruptcy Code Section 510(b) Against**

24          **Defendants Perry, Gramley, Haden, and Willison)**

25

26     252.   Plaintiff incorporates by reference and re-alleges the allegations in

27 Paragraphs 1-251, as though fully set forth herein.

28                - 64 -

COMPLAINT WITH OBJECTIONS AND COUNTERCLAIMS TO DEFENDANTS' CLAIMS

253.   Some or all claims in the Defendants Perry, Gramley, Haden, and Willison's Proofs of Claim are claims for damages arising from the purchase or sale of Bancorp stock, or for reimbursement or contribution allowed under section 502 on account of such a claim, including alleged indemnity or contribution rights that those defendants claim they are entitled to assert against Bancorp relating to pending ERISA, securities class actions, and other claims to which they are or have been named as defendants.

254.   Bankruptcy Code section 510(b) provides:

> For the purpose of distribution under this title, a claim arising from rescission of a purchase or sale of a security of the debtor or of an affiliate of the debtor, for damages arising from the purchase or sale of such a security, or for reimbursement or contribution allowed under section 502 on account of such a claim, shall be subordinated to all claims or interests that are senior to or equal the claim or interest represented by such security, except that if such security is common stock, such claim has the same priority as common stock.

11 U.S.C. § 510(b).

255.   Therefore, the Court should subordinate the FDIC Claims to the general unsecured claims against Bancorp's estate to the full extent permitted by Bankruptcy Code section 510(b).

### Count III

**(Subordination of Claims Under Bankruptcy Code Section 510(c) Against All Defendants)**

256.   Plaintiff incorporates by reference and re-alleges the allegations in Paragraphs 1-255, as though fully set forth herein.

257.   Each of the Defendants is an insider of Bancorp (under the definition of the Bankruptcy Code) and owed fiduciary duties to Bancorp.

258.   Each of the Defendants engaged in the inequitable conduct described in this Complaint.  This inequitable conduct includes, but is it not limited to, the

- 65 -

1  Defendants' breach of their duties of care, loyalty, and good faith, as well as their

2  duty to oversee and manage Bancorp; their abdication of responsibility and

3  decision-making; their failure to supervise management at Bancorp; their

4  deliberate wasting of Bancorp's corporate assets by downstreaming monies from

5  Bancorp to the Bank; their failure to review and act properly upon potential

6  opportunities to raise needed capital from outside investors or find purchasers for

7  Bancorp's assets; and their failure to recognize and act upon financial red flags

8  regarding Bancorp's weak financial condition.

9      259.  Defendants' inequitable conduct has resulted in injury to creditors or

10  the conferring of an unfair advantage on the Defendants, particularly with respect

11  to the claims they now assert, which are based on their positions as members of

12  Bancorp's Board.  This inequitable conduct has resulted in harm to Bancorp and

13  to its entire creditor body.

14      260.  Bankruptcy Code section 510(c) provides, in relevant part:

15      Notwithstanding subsections (a) and (b) of this section, after notice and a
        hearing, the court may–
16

17          (1) under principles of equitable subordination, subordinate for
            purposes of distribution all or part of an allowed claim to all or part
            of another allowed claim or all or part of an allowed interest to all or
18          part of another allowed interest.

19  11 U.S.C. § 510(c).

20      261.  Each of the Defendants' Proofs of Claim is subject to equitable

21  subordination based upon the inequitable conduct and multiple breaches of

22  fiduciary duties of the Defendants as described in this Complaint.

23      262.  Principles of equitable subordination require that each of the

24  Defendants' Proofs of Claim be equitably subordinated to the general unsecured

25  claims against Bancorp.

26      263.  Equitable subordination as requested herein is consistent with the

27  provisions and purposes of the Bankruptcy Code.

28                                    - 66 -

COMPLAINT WITH OBJECTIONS AND COUNTERCLAIMS TO DEFENDANTS' CLAIMS

264.    Therefore, the Court should equitably subordinate each of the Defendants' Proofs of Claim to the general unsecured claims against Bancorp's estate.

**B.    <u>Counts Based on Allegations Solely Related to Events in 2008</u>**

**<u>Count IV</u>**

**(Claim for Breach of Duty of Care Against All Defendants)**

265.    Plaintiff incorporates by reference and re-alleges the allegations in Paragraphs 1-77, as though fully set forth herein.

266.    Each of the Director Defendants, by virtue of his or her status as a director of Bancorp, owed a fiduciary duty of care to Bancorp.

267.    By reason of their fiduciary relationships, each Defendant owed Bancorp the highest obligation of due care in managing and administering the affairs of Bancorp.

268.    Each Defendant was responsible for the gross and reckless mismanagement of Bancorp.  In so doing, each Defendant abdicated and deliberately disregarded their corporate responsibilities by acting with reckless indifference and in bad faith and mismanaged Bancorp in at least the following ways:

        (a)    Abdicating their decision-making responsibilities by failing to sufficiently scrutinize critical business decisions.  These sustained and systemic failures included the failure to consider replacing the senior managers, who developed, executed, and stubbornly clung to Bancorp's risky business strategy, the conscious failure to oversee management's activities related to capital raising, and the conscious failure to oversee management's activities with respect to business strategies.

        (b)    Permitting Bancorp to improperly backdate $18 million of a $50 million capital contribution from May 9, 2008 to March 31, 2008 in an effort to

COMPLAINT WITH OBJECTIONS AND COUNTERCLAIMS TO DEFENDANTS' CLAIMS

obscure and otherwise avoid the Bank's non-compliance with required Risk-Based Capital ratios. At the time this transfer was authorized, Defendants knew that the amount transferred would not prevent the Bank's failure and would serve merely to deplete the cash reserves of Bancorp.

(c) Allowing Bancorp to improperly and imprudently contribute capital (2008 Downstream Transfers) to the Bank. The 2008 Downstream Transfers were insufficient to save the Bank absent massive structural changes in the Bank's operations that the Director Defendants simply failed to effectuate. Indeed, before making $120 million in 2008 Identified Transfers, the Director Defendants were or should have been aware that such transfers amounted to as much as approximately $3.4 billion less than the Bank needed to avoid failure. These 2008 Downstream Transfers diminished Bancorp's value, depleted Bancorp's cash reserves and Bancorp received no consideration whatsoever for most if not all of the 2008 Downstream Transfers.

(d) Disregarding numerous prudent opportunities to raise capital from outside investors, and in so doing, grossly and consciously failing to recognize the need to raise such capital. To that end, the Defendants acted with reckless indifference by improperly delegating responsibility for, and otherwise failing to, assume any meaningful role in essential capital raising activities by improperly delegating crucial decision-making authority to Perry with respect to the specific opportunities; and consciously failing to monitor his activities, conducting little or no due diligence on potential transactions, and failing to form a Board Committee focused on dire capital raising needs until April 24, 2008, just two months before the OTS seized the Bank and far too late to have any effect.

(e) Failing to heed and act upon red flags that indicated the Bank's business model was not sustainable, including, among other things during 2008, the heightened regulatory scrutiny of the Bank, negative analyst reports, and continued increases in EPDs and repurchase demands. This deliberate disregard and reckless indifference by Defendants resulted in their failure to adequately oversee and manage Bancorp's exposure to the mortgage market.

- 68 -

COMPLAINT WITH OBJECTIONS AND COUNTERCLAIMS TO DEFENDANTS' CLAIMS

1    269.   By reason of the foregoing, each Defendant deliberately disregarded

2   his or her duties, acted with reckless indifference to Bancorp, acted in bad faith,

3   and has breached his or her fiduciary duties of care to Bancorp.

4    270.   As a direct and proximate result of the Defendants' bad faith,

5   reckless indifference, and breaches of duties of care alleged herein, Bancorp, and

6   thus the estate of Bancorp, has been injured and has suffered damages in an

7   amount to be proven at trial, but believed and hereby alleged to be not less than

8   the amount of the 2008 Downstream Transfers plus the value of any other

9   assets—both tangible and intangible—that Bancorp lost as a result of the OTS's

10   seizure of the Bank and Bancorp's subsequent bankruptcy petition.

11    271.   Defendants' breaches of their fiduciary duty of care were committed

12   and motivated by a conscious and deliberate disregard and reckless indifference of

13   the interests of Bancorp, sufficient to evidence an evil mind.  The interests of

14   Bancorp were subject to foreseeable harm by such acts and/or omissions.  The

15   deliberate and grossly reckless acts and/or omissions of the Defendants resulted in

16   actual harm to Bancorp.  Accordingly, to punish such acts and deter others from

17   similar wrongdoing, the Trustee should be awarded punitive damages, in an

18   amount to be proven at trial.

### Count V

### (Claim for Breach of Duties of Loyalty and Good Faith Against All Defendants)

23    272.   Plaintiff incorporates by reference and re-alleges the allegations in

24   Paragraphs 1-77 and 265-271, as though fully set forth herein.

25    273.   Each of the Director Defendants, by virtue of his or her status as a

26   director of Bancorp, owed fiduciary duties of loyalty and good faith to Bancorp.

- 69 -

1    274.   By reason of their fiduciary relationships, each Defendant owed

2  Bancorp the highest obligations of loyalty and good faith in managing and

3  administering the affairs of Bancorp.  This included acting in the best interests of

4  Bancorp, monitoring management's operations, and refraining from any conduct

5  that would harm Bancorp.

6    275.   Each Defendant failed to act in the best interests of Bancorp and

7  engaged in harmful conduct to Bancorp.  In so doing, each Defendant abdicated

8  their corporate responsibilities by consciously failing to stay informed,

9  consciously failing to supervise management, and consciously failing to monitor

10  Bancorp's operations in at least the following ways:

(a)    Abdicating their decision-making responsibilities by failing to sufficiently scrutinize critical business decisions.  These sustained and systemic failures included the failure to consider replacing the senior managers, who developed, executed, and stubbornly clung to Bancorp's risky business strategy, the conscious failure to oversee management's activities related to capital raising, and the conscious failure to oversee management's activities with respect to business strategies.

(b)    Permitting Bancorp to improperly backdate $18 million of a $50 million capital contribution from May 9, 2008 to March 31, 2008 in an effort to obscure and otherwise avoid the Bank's non-compliance with required Risk-Based Capital ratios.  At the time this transfer was authorized, Defendants knew that the amount transferred would not prevent the Bank's failure and would serve merely to deplete the cash reserves of Bancorp.

(c)    Allowing Bancorp to improperly and imprudently contribute capital (2008 Downstream Transfers) to the Bank.  The 2008 Downstream Transfers were insufficient to save the Bank absent massive structural changes in the Bank's operations that the Director Defendants simply failed to effectuate.  Indeed, before making $120 million in 2008 Identified Transfers, the Director Defendants were or should have been aware that such transfers amounted to as much as

- 70 -

COMPLAINT WITH OBJECTIONS AND COUNTERCLAIMS TO DEFENDANTS' CLAIMS

approximately $3.4 billion less than the Bank needed to avoid failure. These 2008 Downstream Transfers diminished Bancorp's value, depleted Bancorp's cash reserves and Bancorp received no consideration whatsoever for most if not all of the 2008 Downstream Transfers.

(d)    Disregarding numerous prudent opportunities to raise capital from outside investors, and in so doing, grossly and consciously failing to recognize the need to raise such capital. To that end, the Defendants acted with reckless indifference by improperly delegating responsibility for, and otherwise failing to, assume any meaningful role in essential capital raising activities by improperly delegating crucial decision-making authority to Perry with respect to the specific opportunities; and consciously failing to monitor his activities, conducting little or no due diligence on potential transactions, and failing to form a Board Committee focused on dire capital raising needs until April 24, 2008 just two months before the OTS seized Bancorp and far too late to have any effect.

(e)    Failing to heed and act upon red flags that indicated the Bank's business model was not sustainable, including, among other things during 2008, the heightened regulatory scrutiny of the Bank, negative analyst reports, and continued increases in EPDs and repurchase demands. This deliberate disregard and reckless indifference by Defendants resulted in their failure to adequately oversee and manage Bancorp's exposure to the mortgage market.

276.    By reason of the foregoing, each Defendant acted in bad faith and against the best interests of Bancorp, consciously disregarded their responsibilities, failed to monitor and oversee Perry and management, and has breached his or her fiduciary duties of loyalty and good faith to Bancorp.

277.    As a direct and proximate result of the Defendants' bad faith, conscious disregard of their responsibilities, failure to monitor and oversee Perry and management, and breaches of duties of loyalty and good faith alleged herein, Bancorp, and thus the estate of Bancorp, has been injured and has suffered damages in an amount to be proven at trial, but believed and hereby alleged to be

COMPLAINT WITH OBJECTIONS AND COUNTERCLAIMS TO DEFENDANTS' CLAIMS

1  not less than the amount of the 2008 Downstream Transfers plus the value of any

2  other assets—both tangible and intangible—that Bancorp lost as a result of the

3  OTS's seizure of the Bank and Bancorp's subsequent bankruptcy petition.

4      278.   Defendants' breaches of their fiduciary duties of loyalty and good

5  faith were committed and motivated by a conscious and deliberate disregard of

6  the interests of Bancorp, sufficient to evidence an evil mind.  The interests of

7  Bancorp were subject to foreseeable harm by such acts and/or omissions.  The

8  conscious, deliberate and grossly reckless acts and/or omissions of the defendants

9  resulted in actual harm to Bancorp.  Accordingly, to punish such acts and deter

10  others from similar wrongdoing, the Trustee should be awarded punitive damages,

11  in an amount to be proven at trial.

## Count VI

### (Claim for Corporate Waste Against All Defendants)

15      279.   Plaintiff incorporates by reference and re-alleges the allegations in

16  Paragraphs 1-77 and 265-278, as though fully set forth herein.

17      280.   As a result of the 2008 Downstream Transfers, and by failing to

18  properly consider the interests of Bancorp, Defendants have caused Bancorp to

19  waste valuable corporate assets by:

(a)  Executing these one-sided 2008 Downstream
Transfers, which did not reflect a fair exchange
for Bancorp because they diminished Bancorp's
value, depleted Bancorp's cash, and Bancorp
received no consideration whatsoever for most, if
not all of the 2008 Downstream Transfers.
Indeed, before making $120 million in 2008
Identified Transfers, the Defendants were aware
or should have been aware that such transfers
amounted to as much as approximately $3.4
billion less than the Bank needed to avoid failure.
Thus, the 2008 Downstream Transfers were made
against Bancorp's best interests and in bad faith.

(b)  Permitting Bancorp to improperly backdate $18
million dollars of a $50 million capital

- 72 -

COMPLAINT WITH OBJECTIONS AND COUNTERCLAIMS TO DEFENDANTS' CLAIMS

contribution from May 9, 2008 to March 31, 2008 in a misguided effort to hide the Bank's non-compliance with required Risk-Based Capital ratios.  At the time the Defendants authorized this transfer, they knew that the amount transferred would not prevent the Bank's failure and would serve merely to deplete the cash reserves of Bancorp and, therefore, was executed against Bancorp's best interests and in bad faith.

281.   When Director Defendants became aware of these 2008 Downstream Transfers (by either approving them prior to their execution or learning of them after-the-fact), the depleted nature of Bancorp's cash reserves, and the lack of consideration received by Bancorp, Defendants took no action to prevent the 2008 Downstream Transfers, which resulted in no value and consideration for Bancorp.

282.   As a direct and proximate result of the Defendants' bad faith and waste of corporate assets, Bancorp, and thus the estate of Bancorp, has been injured and has suffered damages in an amount to be proven at trial, but believed and hereby alleged to be not less than the amount of the 2008 Downstream Transfers plus the value of any other assets—both tangible and intangible—that Bancorp lost as a result of the OTS's seizure of the Bank and Bancorp's subsequent bankruptcy petition.

283.   Defendants' waste of corporate of assets was committed and motivated by a conscious and deliberate disregard and reckless indifference of the interests of Bancorp, sufficient to evidence an evil mind.  The interests of Bancorp were subject to foreseeable harm by such acts and/or omissions.  The deliberate and grossly reckless acts and/or omissions of the Defendants resulted in actual harm to Bancorp.  Accordingly, to punish such acts and deter others from similar wrongdoing, the Trustee should be awarded punitive damages, in an amount to be proven at trial.

COMPLAINT WITH OBJECTIONS AND COUNTERCLAIMS TO DEFENDANTS' CLAIMS

## C.    Counts Based on Additional Factual Allegations

## Count VII

### (Claim for Breach of Duty of Care Against All Defendants)

284.    Plaintiff incorporates by reference and re-alleges the allegations in Paragraphs 1-283, as though fully set forth herein.

285.    Each of the Director Defendants, by virtue of his or her status as a director of Bancorp, owed a fiduciary duty of care to Bancorp.

286.    By reason of their fiduciary relationships, each Defendant owed Bancorp the highest obligation of due care in managing and administering the affairs of Bancorp.

287.    Each Defendant was responsible for the gross and reckless mismanagement of Bancorp.  In so doing, each Defendant abdicated and deliberately disregarded their corporate responsibilities by acting with reckless indifference and in bad faith and mismanaged Bancorp in at least the following ways:

(a)    Abdicating their decision-making responsibilities by failing to sufficiently scrutinize critical business decisions.  These sustained and systemic failures included the failure to consider replacing the senior managers, who developed, executed, and stubbornly clung to Bancorp's risky business strategy, the conscious failure to oversee management's activities related to capital raising, and the conscious failure to oversee management's activities with respect to business strategies.

(b)    Allowing Bancorp to improperly and imprudently contribute capital (2007 Downstream Transfers) to the Bank.  The 2007 Downstream Transfers were insufficient to save the Bank absent massive structural changes in the Bank's operations that the Director Defendants simply failed to effectuate.  Indeed, before making $235 million in 2007 Identified Transfers, the Defendants were or should have been aware that such transfers

- 74 -

COMPLAINT WITH OBJECTIONS AND COUNTERCLAIMS TO DEFENDANTS' CLAIMS

amounted to far less than the Bank needed to avoid failure. These 2007 Downstream Transfers diminished Bancorp's value, depleted Bancorp's cash reserves and Bancorp received no consideration whatsoever for most if not all of the 2007 Downstream Transfers.

(c)    Disregarding numerous prudent opportunities to raise capital from outside investors, and in so doing, grossly and consciously failing to recognize the need to raise such capital. To that end, the Defendants acted with reckless indifference by improperly delegating responsibility for, and otherwise failing to, assume any meaningful role in essential capital raising activities by improperly delegating crucial decision-making authority to Perry with respect to the specific opportunities; and consciously failing to monitor his activities, conducting little or no due diligence on potential transactions, failing to retain experienced investment advisors until months after considering and rejecting offers from, among other investors, Warburg and MetLife, and deciding to simply ignore many other investment offers.

(d)    Failing to heed and act upon red flags that indicated the Bank's business model and origination practices were not sustainable. Indeed, as early as October 2006 (if not earlier), red flags were waved at Defendants indicating the Bank's business model and origination practices were deeply flawed. These included, but were not limited to, negative analyst reports, the appreciable increase in EPDs and repurchase demands, the decline in loan sales and forecasting errors, and the Bank's complete lack of any meaningful or proper mortgage loan underwriting standards. This deliberate disregard and reckless indifference by the Defendants resulted in their failure to adequately oversee and manage Bancorp's exposure to the mortgage market and to ensure even the most basic underwriting standards were in place at the Bank, thereby greatly and needlessly exacerbating such exposure.

288.    By reason of the foregoing, each Defendant deliberately disregarded his or her duties, acted with reckless indifference to Bancorp, acted in bad faith and has breached his or her fiduciary duties of care to Bancorp.

COMPLAINT WITH OBJECTIONS AND COUNTERCLAIMS TO DEFENDANTS' CLAIMS

289.   As a direct and proximate result of the Defendants' bad faith, reckless indifference, and breaches of duties of care alleged herein, Bancorp, and thus the estate of Bancorp, has been injured and has suffered damages in an amount to be proven at trial, but believed and hereby alleged to be not less than the amount of the 2007 Downstream Transfers plus the value of any other assets—both tangible and intangible—that Bancorp lost as a result of the OTS's seizure of the Bank and Bancorp's subsequent bankruptcy petition.

290.   Defendants' breaches of their fiduciary duty of care were committed and motivated by a conscious and deliberate disregard and reckless indifference of the interests of Bancorp, sufficient to evidence an evil mind.  The interests of Bancorp were subject to foreseeable harm by such acts and/or omissions.  The deliberate and grossly reckless acts and/or omissions of the Defendants resulted in actual harm to Bancorp.  Accordingly, to punish such acts and deter others from similar wrongdoing, the Trustee should be awarded punitive damages, in an amount to be proven at trial.

## Count VIII

### (Claim for Breach of Duties of Loyalty and Good Faith
### Against All Defendants)

291.   Plaintiff incorporates by reference and re-alleges the allegations in Paragraphs 1-290, as though fully set forth herein.

292.   Each of the Director Defendants, by virtue of his or her status as a director of Bancorp, owed fiduciary duties of loyalty and good faith to Bancorp.

293.   By reason of their fiduciary relationships, each Defendant owed Bancorp the highest obligations of loyalty and good faith in managing and administering the affairs of Bancorp.  This included acting in the best interests of

- 76 -

1  Bancorp, monitoring management's operations, and refraining from any conduct

2  that would harm Bancorp.

3      294.   Each Defendant failed to act in the best interests of Bancorp and

4  engaged in harmful conduct to Bancorp.  In so doing, each Defendant abdicated

5  their corporate responsibilities by consciously failing to stay informed,

6  consciously failing to supervise management, and consciously failing to monitor

7  Bancorp's operations in at least the following ways:

     (a)   Abdicating their decision-making responsibilities by failing to sufficiently scrutinize critical business decisions.  These sustained and systemic failures included the failure to consider replacing the senior managers, who developed, executed, and stubbornly clung to Bancorp's risky business strategy, the conscious failure to oversee management's activities related to capital raising, and the conscious failure to oversee management's activities with respect to business strategies.

     (b)   Allowing Bancorp to improperly and imprudently contribute capital (2007 Downstream Transfers) to the Bank.  The 2007 Downstream Transfers were insufficient to save the Bank absent massive structural changes in the Bank's operations that the Director Defendants simply failed to effectuate.  Indeed, before making $235 million in 2007 Identified Transfers, the Defendants were or should have been aware that such transfers amounted to far less than the Bank needed to avoid failure.  These 2007 Downstream Transfers diminished Bancorp's value, depleted Bancorp's cash reserves and Bancorp received no consideration whatsoever for most if not all of the 2007 Downstream Transfers.

     (c)   Disregarding numerous prudent opportunities to raise capital from outside investors, and in so doing, grossly and consciously failing to recognize the need to raise such capital.  To that end, the Defendants acted with reckless indifference by improperly delegating responsibility for, and otherwise failing to, assume any meaningful role in essential capital raising activities by improperly delegating crucial decision-making authority to Perry with respect to the specific opportunities; and consciously failing

- 77 -

COMPLAINT WITH OBJECTIONS AND COUNTERCLAIMS TO DEFENDANTS' CLAIMS

to monitor his activities, conducting little or no due diligence on potential transactions, failing to retain experienced investment advisors until months after considering and rejecting offers from, among other investors, Warburg and MetLife, and deciding to simply ignore many other investment offers.

(d)    Failing to heed and act upon red flags that indicated the Bank's business model and origination practices were not sustainable.  Indeed, as early as October 2006 (if not earlier), red flags were waved at Defendants indicating the Bank's business model and origination practices were deeply flawed.  These included, but were not limited to, negative analyst reports, the appreciable increase in EPDs and repurchase demands, the decline in loan sales and forecasting errors, and the Bank's complete lack of any meaningful or proper mortgage loan underwriting standards.  This deliberate disregard and reckless indifference by the Defendants resulted in their failure to adequately oversee and manage Bancorp's exposure to the mortgage market and to ensure even the most basic underwriting standards were in place at the Bank, thereby greatly and needlessly exacerbating such exposure.

295.   By reason of the foregoing, each Defendant acted in bad faith and against the best interests of Bancorp, consciously disregarded their responsibilities, failed to monitor and oversee Perry and management, and has breached his or her fiduciary duties of loyalty and good faith to Bancorp.

296.   As a direct and proximate result of the Defendants' bad faith, conscious disregard of their responsibilities, failure to monitor and oversee Perry and management, and breaches of duties of loyalty and good faith alleged herein, Bancorp, and thus the estate of Bancorp, has been injured and has suffered damages in an amount to be proven at trial, but believed and hereby alleged to be not less than the amount of the 2007 Downstream Transfers plus the value of any other assets—both tangible and intangible—that Bancorp lost as a result of the OTS's seizure of the Bank and Bancorp's subsequent bankruptcy petition.

- 78 -

COMPLAINT WITH OBJECTIONS AND COUNTERCLAIMS TO DEFENDANTS' CLAIMS

297.   Defendants' breaches of their fiduciary duties of loyalty and good faith were committed and motivated by a conscious and deliberate disregard of the interests of Bancorp, sufficient to evidence an evil mind.  The interests of Bancorp were foreseeably subject to harm by such acts and/or omissions.  The deliberate and grossly reckless acts and/or omissions of the defendants resulted in actual harm to Bancorp.  Accordingly, to punish such acts and deter others from similar wrongdoing, the Trustee should be awarded punitive damages, in an amount to be proven at trial.

## <u>Count IX</u>

### (Claim for Corporate Waste Against All Defendants)

298.   Plaintiff incorporates by reference and re-alleges the allegations in Paragraphs 1-297, as though fully set forth herein.

299.   As a result of these 2007 Downstream Transfers, and by failing to properly consider the interests of Bancorp, Defendants have caused Bancorp to waste valuable corporate assets by:

> (a)   Executing these one-sided 2007 Downstream Transfers, which did not reflect a fair exchange for Bancorp because they diminished Bancorp's value, depleted Bancorp's cash, and Bancorp received no consideration whatsoever for most, if not all of the Downstream Transfers.  Indeed, before making $235 million in 2007 Identified Transfers, the Defendants were aware or should have been aware that such transfers amounted far less than the Bank needed to avoid failure.  Thus, the 2007 Downstream Transfers were made against Bancorp's best interests and in bad faith.

300.   When Director Defendants became aware of these 2007 Downstream Transfers (by either approving them prior to their execution or learning of them after-the-fact), the depleted nature of Bancorp's cash reserves, and the lack of consideration received by Bancorp, Defendants took no action to prevent the 2007

- 79 -

Downstream Transfers or future wasteful downstream transfers, including the 2008 Downstream Transfers, which resulted in no value and consideration for Bancorp.

301.   As a direct and proximate result of the Defendants' bad faith and waste of corporate assets, Bancorp, and thus the estate of Bancorp, has been injured and has suffered damages in an amount to be proven at trial, but believed and hereby alleged to be not less than the amount of the 2007 Downstream Transfers plus the value of any other assets—both tangible and intangible—that Bancorp lost as a result of the OTS's seizure of the Bank and Bancorp's subsequent bankruptcy petition.

302.   Defendants' waste of corporate of assets was committed and motivated by a conscious and deliberate disregard and reckless indifference of the interests of Bancorp, sufficient to evidence an evil mind.  The interests of Bancorp were foreseeably subject to harm by such acts and/or omissions.  The deliberate and grossly reckless acts and/or omissions of the Defendants resulted in actual harm to Bancorp.  Accordingly, to punish such acts and deter others from similar wrongdoing, the Trustee should be awarded punitive damages, in an amount to be proven at trial.

## VI.   **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully prays that this Court:

1. Disallow each of the Defendants' Proofs of Claim or, to the extent that any of the Proofs of Claim are allowed at all, allow them only in an amount that reflects (a) enforceable obligations against Bancorp under applicable law and (b) an appropriate credit for the offsets and recoupment set forth hereinabove.

COMPLAINT WITH OBJECTIONS AND COUNTERCLAIMS TO DEFENDANTS' CLAIMS

1    2. Subordinate each of the Defendants' Proofs of Claim to the general

2    unsecured claims against Bancorp's estate.

3    3. Award actual damages to be established at trial, but not less than the

4    amount of the 2007 and 2008 Downstream Transfers plus the value of any

5    other assets—both tangible and intangible—that Bancorp lost as a result of

6    the OTS's seizure of the Bank and Bancorp's subsequent bankruptcy

7    petition.

8    4. Award punitive damages to be established at trial.

9    5. Award Plaintiff's costs and reasonable attorneys fees.

10   6. Award such other relief as the court deems just and proper.

11   Dated:  November 13, 2009

12                          KLEE, TUCHIN, BOGDANOFF & STERN LLP

13                          By:

14                              Lee R. Bogdanoff (State Bar No. 119542)
15                              David M. Stern (State Bar No. 67697)
16                              Matthew C. Heyn (State Bar No. 227474)

17                          General Bankruptcy Counsel for Plaintiff and
18                          Chapter 7 Trustee Alfred H. Siegel

19

20                          BUCKLEYSANDLER LLP
                            Andrew L. Sandler *(Admitted Pro Hoc Vice)*
21                          Benjamin B. Klubes *(Admitted Pro Hoc Vice)*
                            Benjamin P. Saul *(Pro Hac Vice* Admittance Pending)
22                          Caitlin M. Kasmar (To be Admitted *Pro Hac Vice*)
23                          Bradley A. Marcus (To be Admitted *Pro Hac Vice*)

24                          Special Counsel for Plaintiff and
25                          Chapter 7 Trustee Alfred H. Siegel

26

27

28                          - 81 -

COMPLAINT WITH OBJECTIONS AND COUNTERCLAIMS TO DEFENDANTS' CLAIMS